Donna PACK, Ann Bowling, and Linda Pearson, Individually and as Representatives of the Estate of James Watson, Appellants,

v.

CROSSROADS, INC. a/k/a Way of the Cross, Inc. d/b/a Watson Memorial Nursing Home, Sharon Chapman, Bessie Stovall, and Theresa Butler, Appellees.

No. 2–00–219–CV.

Court of Appeals of Texas, Fort Worth.

July 26, 2001.

Rehearing Overruled Sept. 20, 2001.

Friend & Associates, L.L.P., Gail N. Friend, McKinney, Shannon, Gracey, Ratliff & Miller, L.L.P. and Joseph W. Spence, Fort Worth, for Appellant.

Suchocki, Bullard & Cummings, Bernard R. Suchocki and Jerry D. Bullard, Fort Worth, for Appellee.

Panel A: CAYCE, C.J.; DAY and DAUPHINOT, JJ.

### OPINION

SAM J. DAY, Justice.

### I. INTRODUCTION

This is an appeal from a take nothing judgment rendered against Appellants Donna Pack, Ann Bowling, and Linda Pearson, individually and as representatives of the estate of James Watson. Appellants raise seven issues on appeal. In their first issue, Appellants allege that the trial court erred in refusing to submit a requested jury question. Appellants contend in their second issue that the trial court erred in limiting the admissibility of evidence. In their third issue, Appellants argue the trial court erred in refusing to permit them to obtain evidence. Appellants complain in their fourth and fifth issues about the trial court's prohibition against the admission of certain exhibits and testimony. In their sixth issue, Appellants assert that the trial court erred in striking their negligence per se claims. Lastly, in their seventh issue, Appellants claim the evidence was factually insufficient to support a finding in favor of Appellees. We affirm.

### II. BACKGROUND

Watson was hospitalized at North Hills Hospital on February 23, 1995 to undergo surgery for a fractured hip. After the surgery, Mr. Watson experienced health problems that led to continued treatment at Transitional Hospital Corporation (THC) and Westpark Nursing Home. He was ultimately admitted to Watson Memorial Nursing Home in August 1995, six months after his hip surgery. Watson was then transported to Harris Methodist Hospital on September 24, 1995. There, doctors noted Watson's physical condition: tongue coated with a thick membrane; dry mucous membranes; fecal material on perineum and legs; cloudy urine; gangrene of the right foot; and decubiti on the heels of his feet and his right hip. The hospital believed that these conditions were due to abuse or neglect and contacted the Texas Department of Human Services (TDHS). Watson died on October 2, 1995 at Harris Methodist Hospital. Appellants, Watson's surviving children, filed suit against Appellees Crossroads Evangelism, Inc. d/b/a Watson Memorial Nursing Home, Sharon Chapman, Bessie Stovall, and Theresa Butler (collectively "Watson Memorial") for negligence, negligence per se, gross negligence, wrongful death, DTPA, fraud, and negligent misrepresentations. Appel-

lants sought damages under the Texas Survival Statute and the Wrongful Death Act. The jury returned a take nothing judgment in favor of Watson Memorial.

## III. ADMISSIBILITY OF EVIDENCE

Appellants argue in their second and fifth issues that the trial court erred in excluding evidence. In their second issue, Appellants contend the trial court erred in limiting the admissibility of certain TDHS records. Specifically, the trial court limited the admissibility of the records in question to only those entries involving Watson, instead of allowing the Appellants to admit the entries involving other residents of Watson Memorial, which Appellants argue would have shown a pattern of neglect on the part of Watson Memorial. In their fifth issue, Appellants allege the trial court erred in prohibiting the admission of Harris Methodist Hospital records and the testimony of Dr. James Cox, which alleged that Watson was the victim of abuse, neglect, or both.

### A. STANDARD OF REVIEW

The admission and exclusion of evidence is committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex.1995); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). A person seeking to reverse a judgment based on evidentiary error need not prove that but for the error a different judgment would necessarily have been rendered, but only that the error probably resulted in an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex.1992); *King v. Skelly*, 452 S.W.2d 691, 696 (Tex.1970). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *GT & MC, Inc. v. Tex. City Ref., Inc.*, 822

S.W.2d 252, 257 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *Atl. Mut. Ins. Co. v. Middleman*, 661 S.W.2d 182, 185 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (op. on reh'g.). We determine whether the case turns on the excluded evidence by reviewing the entire record. *Boothe v. Hausler*, 766 S.W.2d 788, 789 (Tex.1989); *Gee*, 765 S.W.2d at 396.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles. *Garcia v. Martinez*, 988 S.W.2d 219, 222 (Tex.1999); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). In other words, we must determine if the act was arbitrary or unreasonable. *Downer*, 701 S.W.2d at 242. Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 241–42.

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex.1978); *see also Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex.1997). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

### B. TDHS RECORDS

Appellants attempted to introduce several records TDHS compiled during investigations of Watson Memorial from 1992 to 1995. These records reflected certain conditions of care of several resi-

dents prior to and contemporaneous with Watson's residency at Watson Memorial. Appellants argued that these documents contained examples of conditions of other residents that were similar to those suffered by Watson; therefore, Watson Memorial should have been on notice of conditions that could lead to Watson's injuries. Watson Memorial objected to these documents on the basis that the documents were irrelevant, the probative value was outweighed by unfair prejudice, and they would confuse the issue and mislead the jury. The trial court sustained Watson Memorial's objections and limited the introduction of the documents to those portions relating specifically to Watson.

■ According to the rules of evidence, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Proximate causation has two distinct elements: (1) cause in fact and (2) foreseeability. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992) (op. on reh'g.). Appellants arguments suggest that the TDHS documents were relevant because they established the foreseeability element of causation. Therefore, based on this argument, the documents were relevant to the proximate cause of Watson's injuries.

■ Even relevant evidence, however, may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. TEX.R. EVID. 403. In a medical malpractice cause of action, the plaintiff must prove by competent testimony that the defendant's negligence proximately caused the plaintiff's

injury. *White v. Wah,* 789 S.W.2d 312, 315 (Tex.App.—Houston [1st Dist.] 1990, no writ). Furthermore, expert testimony is required to prove negligence or gross negligence unless the form or mode of treatment is a matter of common knowledge, or the matter is within the experience of a layperson. *Hood v. Phillips,* 554 S.W.2d 160, 165–66 (Tex.1977); *see also Shook v. Herman,* 759 S.W.2d 743, 747 (Tex.App.—Dallas 1988, writ denied). Therefore, Appellants had the burden to establish from expert testimony: (1) the standard of care, (2) the facts which show that the nursing home deviated from that standard, and (3) the deviation caused the patient's symptoms. *Rodriguez v. Reeves,* 730 S.W.2d 19, 21 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.). Lay witness testimony about negligence and proximate cause has no probative force in a medical malpractice case. *Flores v. Ctr. for Spinal Evaluation & Rehab.,* 865 S.W.2d 261, 264 (Tex.App.—Amarillo 1993, no writ); *Tilotta v. Goodall,* 752 S.W.2d 160, 163 (Tex.App.—Houston [1st Dist.] 1988, writ denied). The records do not constitute expert testimony. As such, Appellants were unable to use them in order to prove that Watson Memorial could foresee that its omission would injure Watson. Because of the slight probative nature of these documents, their admission would have been overly prejudicial. Therefore, we hold the trial court did not abuse its discretion in refusing to admit the TDHS documents into evidence. Appellant's second issue is overruled.

### C. HARRIS METHODIST HOSPITAL RECORDS AND THE TESTIMONY OF DR. JAMES COX

■ In their fifth issue, Appellants contend the trial court erred in limiting the admissibility of certain records from Harris Methodist Hospital and the testimony of Dr. James Cox. Specifically, Ap-

pellants wanted to introduce, through the hospital records and Dr. Cox's testimony, that Watson's condition upon admittance to the hospital was caused by "suspected elder/spousal abuse or neglect." Appellants also wanted to admit evidence that TDHS was notified of Watson's condition. The trial court found that the references to suspected abuse or neglect were speculative because the hospital and Dr. Cox could only speculate about what had occurred prior to Watson's admittance to the hospital. Therefore, the trial court required the Appellants to redact any statements relating to abuse or neglect from the records and barred Dr. Cox from testifying that Watson's condition had been caused by neglect. The trial court explained that the challenged evidence concerning abuse or neglect would have been "very inflammatory." As a corollary to that ruling, the trial court also barred the Appellants from admitting any references to the fact that the hospital made a report of abuse or neglect to the TDHS.

In this case, Watson was a resident of Watson Memorial for approximately 37 days before being taken to the Harris Methodist Hospital emergency room on September 24, 1995. The hospital reported the alleged abuse and neglect to TDHS the same day Watson was admitted to Harris Methodist Hospital. While Dr. Cox was able to view Watson's physical condition, he did not know how long Watson had lived at Watson Memorial, what conditions he suffered from before he entered Watson Memorial, or the physicians' orders while Watson was at Watson Memorial. Therefore, Dr. Cox had no set of facts upon which he could hypothesize that Watson's injuries were caused by abuse or neglect. However, even if Dr. Cox had a set of facts upon which to base a conclusion that Watson's condition was due to abuse and neglect, there was no evidence that he was able to conclude that Watson's

injuries were caused by Watson Memorial's actions. Therefore, we conclude that the trial court did not abuse its discretion in ruling that the allegations of abuse and neglect were speculative and subject to redaction. We overrule Appellants' fifth issue.

## IV. DISCOVERY

 In their third issue, Appellants assert that the trial court erred in refusing to permit them to obtain photographs that TDHS investigators had taken of Watson during their investigation of Watson Memorial. Prior to trial, the Appellants requested the trial court to compel TDHS to produce the photographs. The trial court refused to compel production, holding that the photographs were confidential and their disclosure was prohibited by section 19.2010(a) of the administrative code. *See* 40 TEX. ADMIN. CODE § 19.2010(a) (1997), *available at http://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewTAC* (Title 40, Pt. 1, Ch. 19, Sbch. U, Rule § 19.2010). The standard of review of a trial court's pretrial discovery order is abuse of discretion. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 916 (Tex.1991).

Section 552.021 of the government code provides for the availability of public information. TEX. GOV'T CODE ANN. § 552.021 (Vernon Supp.2001). However, section 552.101 of the government code excepts certain information from public disclosure if it is considered confidential by law or judicial decision. TEX. GOV'T CODE ANN. § 552.101 (Vernon 1994). Section 242.127 of the health and safety code provides for confidentiality of a "report, record, or working paper used or developed in an investigation" of a nursing facility regarding a complaint of abuse, neglect, and exploitation. TEX. HEALTH & SAFETY CODE ANN. § 242.127 (Vernon 2001). This sec-

tion also provides that confidential information "may be disclosed only for purposes consistent with the rules adopted by the board or the designated agency." *Id.* Section 19.2010(a) of title 40 of the Texas Administrative Code establishes the situations in which investigative records may be provided to the public. Section 19.2010(a) provides in relevant part:

(a) Confidentiality. All reports, records, and working papers used or developed by the Texas Department of Human Services ... in an investigation are confidential and may be released to the public only as provided below.

(1) Completed written investigation reports are open to the public, provided the report is de-identified. The process of de-identification means removing all names and other personally identifiable data, including any information from witnesses and others furnished to [TDHS] as part of the investigation.

40 Tex. Admin. Code § 19.2010(a) (1997), *available at http://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewTAC* (Title 40, Pt. 1, Ch. 19, Sbch. U, Rule § 19.2010).

Watson Memorial relies on a Texas Attorney General opinion that explained that photographs taken during a TDHS investigation are "backup documents" of that investigation and fall within the category of "reports, records, and working papers" protected from disclosure under section 242.127. Tex. Att'y Gen. OR94–597 (1994). Consequently, Watson Memorial argues that the photographs in this case are exempt from disclosure.

Appellants argue that "records" and "working papers" are not defined in the code, and, therefore, there is no statutory guidance as to the types of documents that fall into the two categories. Appellants contend that they are entitled to the photographs because they are purely factual

in content and do not reflect deliberations or thought processes; therefore, they cannot be exempt for disclosure under a claim of privilege. Appellants rely on a Texas Attorney General opinion that explains that a "working paper" does not apply to purely factual material, instead it reflects policy judgments, recommendations, and proposals involved in the preparation of proposed legislation. Tex. Att'y Gen. OR94–033 (1994).

When the legislature has failed to define a word or term, courts will apply its ordinary meaning. *Geters v. Eagle Ins. Co.,* 834 S.W.2d 49, 50 (Tex.1992); *Hopkins v. Spring Indep. Sch. Dist.,* 736 S.W.2d 617, 619 (Tex.1987). When applying the ordinary meaning, courts "may not by implication enlarge the meaning of any word in the statute beyond its ordinary meaning, and implications from any statutory passage or word are forbidden when the legislative intent may be gathered from a reasonable interpretation of the statute as it is written." *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 138 (Tex.App.—Austin 1986, writ ref'd n.r.e.)(emphasis omitted); *Commonwealth of Mass. v. United N. & S. Dev. Co.,* 140 Tex. 417, 168 S.W.2d 226, 229 (1942).

Webster's Dictionary defines "report" as "an account or statement of the facts of a legal case heard and of the decision and opinion of the court or quasi-judicial administrative agency determining the case." Webster's Third International Dictionary 1925 (1981). It also defines "record" as "evidence, knowledge, or information remaining in permanent form" and "an account in writing or print or in some other permanent form intended to perpetuate a knowledge of acts or events." *Id.* at 1898. In this case, the photographs may not be classified as "working papers;" however, the plain meaning of "record"

and "report" seems to encompass such factual documentation. The photographs are a permanent form of the factual representation of Watson's condition, which were taken as a permanent record to use in the TDHS's investigation of the hospital's report of suspected abuse and neglect. The factual basis of the photographs does not somehow negate their classification as a record or report. After all, the goal of an investigation is to determine the facts underlying a complaint or allegation. Therefore, we conclude that the plain meaning of "record" and "report" includes photographs taken in the course of an administrative investigation by an agency.

Appellants also rely on case law that suggests that photographs do not fall within a privilege that might otherwise be applicable. *See Axelson, Inc. v. McIlhany*, 755 S.W.2d 170, 173 (Tex.App.—Amarillo 1988, orig. proceeding) (holding photographs taken by an attorney were not protected from disclosure under the work product privilege of TEX.R. CIV. P. 166b(3)(a)), *leave cond. granted*, 798 S.W.2d 550 (Tex.1990); *Terry v. Lawrence*, 700 S.W.2d 912, 913 (Tex.1985) (explaining that photographs taken during an insurance investigation are not exempt from discovery under the investigative privilege set forth in TEX.R. CIV. P. 166b(3)(d)). However, none of the cases Appellants cite discuss confidentiality of documents otherwise subject to the Open Records Act or that statute specifically provides are confidential. Furthermore, these cases discuss general privileges; however, the photographs at issue in this case are exempt from disclosure because they are part of specific records, reports, and working papers of an investigatory process that section 242.127 provides are confidential. We conclude that the photographs at issue in this case are protected from disclosure by a statutory accord of confidentiality. Therefore, the photographs are not subject to disclosure based on the cases cited by Appellants.

Appellants also argue that section 242.127 was promulgated to protect the privacy interests of the nursing home residents only, and the TDHS was not permitted to refuse disclosure of the photographs unless it could prove section 242.127 and the rules promulgated under that section were intended to protect interests other than the privacy interest of the nursing home resident.

Section 552.023(b) of the government code specifically provides:

A governmental body may not deny access to information to the person, or the person's representative, to whom the information relates on the grounds that the information is considered confidential by privacy principles under this chapter but may assert as grounds for denial of access other provisions of this chapter or other law that are not intended to protect the person's privacy interests.

TEX. GOV'T CODE ANN. § 552.023(b).

Appellants rely on testimony given during the committee hearing on the predecessor of section 242.127 to prove that the legislative intent of section 242.127 was to protect the privacy of the nursing home resident primarily. While discussing the confidentiality portion of the legislation, Senator Lloyd Doggett questioned Dr. F.L. Duff, the Commissioner of Health, about stories Senator Doggett's office had been receiving about people reporting nursing home violations but never being able to get the results of those investigations. The exchange was as follows:

[Sen. Doggett]: [W]hy is it necessary to keep any of the results of complaint processing confidential from the public and in particular the person that made the complaint.

[Dr. Duff]: We give reports of investigations of complaints insofar as the complaint has been investigated and corrected.... The confidentiality I think is mainly for the protection of the individual.

[Sen. Doggett]: You do not have any objection then with regard to release of information about the result of your processing of a complaint to the public?

[Dr. Duff]: As long as it does not violate the privacy of an individual or name the home.

Watson Memorial, however, counters that committee hearings cannot be used as binding evidence of legislative intent. Instead, Watson Memorial relies on an attorney general opinion that explains that section 242.127 protects more than the privacy interests of the individuals involved in the investigation. TEX. ATT'Y GEN. OR95–011 (1995). The Texas Attorney General suggests that section 242.127 protects the investigatory process in general. *Id.*

 In construing statutes, we should consider Attorney General's opinions, especially in cases involving the Open Records Act. *Hancock v. State Bd. of Ins.*, 797 S.W.2d 379, 381 (Tex.App.—Austin 1990, no writ); *Heard v. Houston Post Co.*, 684 S.W.2d 210, 212 (Tex.Civ.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e). Although an Attorney General opinion does not bind a reviewing court, it is entitled to due consideration. *City of Houston v. Houston Chronicle Publ'g*, 673 S.W.2d 316, 322 (Tex.App.—Houston [1st Dist.] 1984, no writ); *Hancock*, 797 S.W.2d at 381.

There is no case law interpreting the statute as to this precise issue. However, after a study of the legislation establishing the statute and the stated purpose of the statute, we find the attorney general's opinion persuasive. The 1995 version of section 242.001 provides the purpose of the chapter that contains the statutory provision at controversy in this case. The legislature provided that the purpose of this chapter was to:

promote the public health, safety, and welfare by providing for the development, establishment, and enforcement of standards for the treatment of residents of institutions and the establishment, construction, maintenance, and operation of institutions that, in the light of advancing knowledge, will promote safe and adequate treatment of residents.

TEX. HEALTH & SAFETY CODE ANN. § 242.001 (Vernon 1992). Therefore, in order to provide and enforce standards for the treatment of nursing home residents, there must be an adequate regulatory process that has a continued integrity. Furthermore, a study of Senate Bill 9, which originally provided the language of section 242.127, suggests that the integrity of the regulatory process is a strong interest to be protected. The confidentiality language of section 242.127 was included in the portion of Senate Bill 9 that discussed reports of abuse and neglect in nursing homes. Act of July 21, 1977, 65th Leg., 1st C.S., ch. 2, § 9, 1977 Tex. Gen. Laws 49, 53 (amended 1997 & 1999) (current version at TEX. HEALTH & SAFETY CODE ANN. § 242.127 (Vernon Supp.2001)). Specifically, this section established who was required to report, the contents of the reports, privileged communications, a central registry, the penalty for failure to report, and confidentiality. *Id.* at 53–55. Therefore, the confidentiality provision at issue in this case was established as a part of the actual regulatory process.

Given the statute's stated purpose, the legislative history, and the Attorney General's opinion, we conclude that TDHS proved an interest in the confidentiality of the records of the investigation aside from the privacy interest of the nursing home

resident. Therefore, the trial court did not abuse its discretion in overruling Appellants' motion to compel TDHS to produce the photographs it took of Watson pursuant to its investigation of Watson Memorial.

Appellants argue that TDHS has waived its complaint that the photographs were exempt from disclosure because it failed to request an Attorney General opinion pursuant to sections 552.301 and 552.307 of the government code. TEX. GOV'T CODE ANN. §§ 552.301(b), 552 .307 (Vernon 1994 & Supp.2001). If a governmental body considers the requested information exempt from disclosure, *and there has been no previous determination on the subject,* section 552.301 requires the governmental body to submit to the Attorney General written statements about why the information should be withheld and request an opinion from the Attorney General not later than the tenth day after receiving the request. TEX. GOV'T CODE ANN. § 552.301(a), (b); *City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 356 (Tex.2000). Likewise, section 552.307 requires the governmental body to request an Attorney General opinion if it "determines that information subject to a special right of access under Section 552.023 is exempt from disclosure under an exception." TEX. GOV'T CODE ANN. § 552.307(a).

In this case, however, the Attorney General had previously ruled that photographs taken during an investigation of abuse and neglect are backup documents of the investigation and as such are considered reports, records, and working papers of the investigation. TEX. ATT'Y GEN. OR94–597 (1994). Therefore, the photographs were confidential by law and excepted from public disclosure under section 242.127. *Id.* The Attorney General had also decided that section 242.127 protects more than the privacy interests of the individuals involved in the investigation; it also protects the department's investigatory process in general. TEX. ATT'Y GEN. OR95–011 (1995). Therefore, TDHS was not required under sections 552 .301 and 552.307 of the government code to request an Attorney General opinion as to whether the photographs were confidential because the Attorney General had provided the answer in prior opinions. Consequently, TDHS did not waive its argument that the photographs were confidential and exempt from disclosure. Appellant's third point is overruled.

## V. EXPERT TESTIMONY

■ Appellants contend in their fourth issue that the trial court erred in limiting Dolores Alford's expert testimony. Alford is a nurse Appellants called to testify about the deficiencies in care Watson Memorial provided Watson. Appellants contend they wanted Alford to testify about the minimum standards of care dictated by Texas statutory and administrative provisions. However, upon Watson Memorial's voir dire examination of Alford, Appellants argue the trial court limited Alford's testimony to the standards of care for the nurses who treated Watson, instead of the standard of care of Watson Memorial in general.

■ "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702. This rule and its federal counterpart impose a special gatekeeping obligation on the trial judge to ensure the reliability of all expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 148, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999); *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713,

722–26 (Tex.1998). The trial judge fulfills this obligation by determining as a precondition to admissibility that: (1) the putative expert is qualified as an expert; (2) the expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline; and (3) the testimony is relevant. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 556 (Tex. 1995). In all respects, rule 702 "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Kumho,* 526 U.S. at 148, 119 S.Ct. at 1175 *(quoting Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591–92, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).

■ At issue here is the first determination—whether Dolores Alford was qualified as an expert to testify that Watson Memorial breached its standard of care. The qualification of a witness to offer expert testimony is a matter committed to the trial court's discretion. *United Blood Services v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997).

■ The role of the trial court in qualifying experts is to ensure "that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex. 1996). The party offering the expert's testimony bears the burden to show the witness possesses "special knowledge as to the very matter on which he proposes to give an opinion." *Id.* at 152–53. General experience in a specialized field does not qualify a witness as an expert. "What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153–54.

In this case, the trial judge found Alford unqualified to testify to the specific standard of care of a nursing home or Watson Memorial's breach of such a standard. At the hearing on Appellant's bill of exceptions, the trial judge identified the opinion that Alford could tender to the jury—the standard of care for a nurse. The trial court also clarified the opinions Alford was prohibited from offering to the jury: (1) the fact that administrative and statutory provisions were violated; (2) the standard of care for a nursing home; and (3) whether Watson Memorial breached the standard of care for a nursing home.

Appellants argue that Alford's experience in nursing home investigations, her knowledge of nursing home regulations, and her academic and clinical training are sufficient to establish her expertise in nursing home standards of care and Watson Memorial's breach of such standards. At trial, Alford testified that she received both a nursing diploma and a Ph.D. Alford explained that she had been a staff nurse and a clinical instructor in a licensed vocational nurse program, the education director of Seaton School of Nursing, an assistant professor of nursing at Texas Women's University in Houston, and is currently a consultant with the Department of Justice to determine why troubled government-run nursing homes are unable to meet regulations. Alford also received a fellowship in the American Academy of Nursing, the Honorary Nurse Practice Award from the American Nurses Association, and has been named as a distinguished alumnus at Louisiana State University and the University of Texas. Alford testified that her experience practicing in nursing homes included: taking students to two nursing homes under a geriatric nurse practitioner program in 1978 in which the students would provide the total care for the residents in the particular sections of the nursing home; fill-

ing in for a registered nurse consultant for three weeks at another nursing home in the late 1970's; consulting nursing homes on resident problems; and teaching aides in nursing homes. Alford also testified that her work with the Department of Justice and TDHS only concerned nursing homes. However, Alford never fully explained her responsibilities with TDHS, and she said that she was under a federal gag order not to be specific about her job with the Department of Justice. Alford also testified that she had written many published works about nursing care in general and in nursing homes specifically and worked with nurses in nursing homes to assess the conditions of residents and develop a care plan to meet their needs.

On voir dire, Alford conceded that she had never worked as a staff nurse or a charge nurse in a nursing home, had never been an administrator of a nursing home, had never performed nursing functions or routine shift work in a nursing home on a day-to-day basis, and the last time Alford delivered health care for someone other than a relative was in 1991 when her clinic closed.

After reviewing the record, we conclude that Appellants did not demonstrate that Alford had particular expertise in the field of nursing home standards of care. Therefore, the trial court did not abuse its discretion in limiting Alford's expert testimony to the standard of care for nurses in a nursing home and excluding Alford's testimony about standards of care for a nursing home in general or Watson Memorial's breach of such a standard. We overrule Appellant's fourth issue.

## VI. NEGLIGENCE PER SE CLAIM

Watson Memorial specially excepted to Appellants' negligence per se claims because: (1) the Medical Liability and Insurance Improvement Act (MLIIA) does not authorize negligence per se claims in medical malpractice lawsuits; (2) the administrative code does not define a standard of care in a private medical malpractice claim; therefore, it cannot constitute negligence per se; (3) Texas Board of Nursing Examiners Rules and Regulations are not standards of care and cannot support a negligence per se claim; (4) the regulations Appellants rely on for their negligence per se claim are not penal in nature; therefore, they cannot be a basis for a negligence per se claim; and (5) the regulations pled by Appellant did not satisfy the required factors for negligence per se as provided for in *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex.1998) (op. on reh'g). The trial court granted Watson Memorial's special exceptions and struck Appellant's negligence per se claim. In their sixth issue, Appellants claim the trial court erred in striking their negligence per se claims. On appeal, however, Appellants only contradict Watson Memorial's interpretation of the MLIIA and the administrative code.

### A. Standard of Review

When a trial court dismisses a case upon special exceptions for failure to state a cause of action, we review that issue of law using a de novo standard of review. *Butler Weldments Corp. v. Liberty Mut. Ins. Co.*, 3 S.W.3d 654, 658 (Tex. App.—Austin 1999, no pet.); *Buecher v. Centex Homes*, 18 S.W.3d 807, 809 (Tex. App.—San Antonio 2000, no pet.) (op. on reh'g). When reviewing a dismissal based upon special exceptions, we also must accept as true all material factual allegations and all factual statements reasonably inferred from the allegations set forth in the appellants' pleadings. *Sorokolit v. Rhodes*, 889 S.W.2d 239, 240 (Tex.1994). If a pleading does not state a cause of action, the trial court does not err in dis-

missing the entire case. *Holt v. Reprod. Servs., Inc.,* 946 S.W.2d 602, 605 (Tex. App.—Corpus Christi 1997, writ denied); *Cole v. Hall,* 864 S.W.2d 563, 566 (Tex. App.—Dallas 1993, writ denied).

### B. NEGLIGENCE PER SE

Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims. *Smith v. Merritt,* 940 S.W.2d 602, 607 (Tex.1997). The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Perry,* 973 S.W.2d at 305. However, affirmative conclusions regarding these questions do not end our analysis. We must still determine whether it is appropriate to impose tort liability for violations of the statute. *Id.; Smith,* 940 S.W.2d at 607–08. In *Perry,* the supreme court outlined several factors to be considered in determining whether it is appropriate to impose tort liability for violations of a particular statute. 973 S.W.2d at 309. Those factors include: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common-law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute. *Id.; Ordonez v. M.W. McCurdy & Co., Inc.,* 984 S.W.2d 264, 268 (Tex.App.—Houston [1st Dist.] 1998, no pet.). The court noted these factors are not exclusive, and the determination of whether to impose negligence per se should not be made merely by counting how many factors lean each way. *Perry,* 973 S.W.2d at 305–06; *Ordonez,* 984 S.W.2d at 268. Rather, the factors should act as guidelines to assist courts in determining the ultimate question of whether imposing tort liability for violations of a statute is fair, workable, and wise. *Perry,* 973 S.W.2d at 305–06; *Ordonez,* 984 S.W.2d at 268.

### C. MEDICAL LIABILITY AND INSURANCE IMPROVEMENT ACT

Watson Memorial asserted in its bill of exception that the MLIIA does not provide for or recognize negligence per se claims. However, Appellants argue that while the language of the MLIIA does not expressly permit negligence per se claims, it does not prohibit them either. Watson Memorial contends that in order to recover under the MLIIA, the plaintiff must prove the negligence by medical expert testimony, unless res ipsa loquitur applies. Because Appellants did not raise res ipsa loquitur in this case, Watson Memorial argues that Appellants are bound to prove any alleged malpractice through expert testimony. Essentially, Watson Memorial contends that to allow Appellants to use the MLIIA as the basis for a negligence per se claim circumvents the very requirements of the MLIIA.

Watson Memorial correctly states the current state of the law. The plaintiff in a medical malpractice case has the burden to prove that the mode of treatment undertaken by the treating physician would not have been undertaken under the same or similar circumstances by a reasonable and prudent member of the medical community. *See Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977). The

Texas Supreme Court has further explained that "[u]nless the mode or form of treatment is a matter of common knowledge or is within the experience of the layman, expert testimony will be required to meet this burden of proof." *Id.* at 165–66. Therefore, the only exception to the general rule that medical expert testimony is required for a plaintiff to satisfy its burden of proof is when the nature of the alleged malpractice and injuries are plainly within the common knowledge of laymen, and res ipsa loquitur is applicable. Tex. Rev.Civ. Stat. Ann. art. 4590i, § 7.01 (Vernon Supp.2001) (providing that res ipsa loquitur applies only in cases in which the appellate courts have already applied res ipsa loquitur); *Haddock v. Arnspiger,* 793 S.W.2d 948, 950–51 (Tex.1990); *Schorlemer v. Reyes,* 974 S.W.2d 141, 145 (Tex. App.—San Antonio 1998, pet. denied). Appellants do not contend that Watson Memorial's treatment of Watson was within the common knowledge of laymen, nor do they contend that res ipsa loquitur is applicable to their case. Instead, Appellants ask this court to conclude that the lack of expert testimony does not preclude an action for negligence per se under the MLIIA. However, with the clarity of the current state of the law, we are unpersuaded that Watson Memorial's argument "lacks merit." Therefore, we conclude that a breach of the MLIIA may not be used as the basis for a negligence per se claim because expert testimony is required to prove a cause of action under the MLIIA.

#### D. Administrative Code

█ Appellants relied on Watson Memorial's alleged breaches of several sections of chapter 19 of title 40 of the Texas Administrative Code as one of their bases for their negligence per se claim. In their bill of exception, however, Watson Memorial argued that chapter 19 of title 40 applies only to a nursing home's licensure and participation in the Medicaid program. Therefore, Watson Memorial alleges chapter 19 of title 40 does not establish a standard of care for a negligence per se claim.

Watson Memorial relies on the stated purpose of chapter 19 as the basis for its argument.

> Scope. The Nursing Facility Requirements for Licensure and Medicaid Certification contain the requirements that an institution must meet in order to be licensed as a nursing facility and also to qualify to participate in the Medicaid program. The requirements serve as a basis for survey activities for licensure and certification.

40 Tex. Admin. Code § 19.1(b) (1997), *available at http://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewTAC* (Title 40, Pt. 1, Ch. 19, Sbch. A, Rule § 19.1(b)).

█ A "penal statute" is one that defines a criminal offense and specifies a corresponding fine, penalty, or punishment. Black's Law Dictionary 1421 (7th ed.1999). Appellants argue that section 19 of title 40 is penal in nature because it provides for administrative penalties for violations. These penalties include, among others, suspension of licenses, revocation of licenses, monetary penalties, and suspension of admissions. 40 Tex. Admin. Code §§ 19.2103–19.2151, *available at http://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewTAC* (Title 40, Pt. 1, Ch. 19, Sbch. V, Divs. 2 & 3). Appellants contend that because the administrative code provides for such a variety of penalties the regulation must be penal. However, the penalties provided for in the enforcement section of chapter 19 of title 40 are civil remedies ranging from a warning letter of noncompliance to license revocation to ad-

ministrative penalties. *Id.* Therefore, based on the stated purpose of chapter 19 and the fact that the administrative code provisions Appellants allege Watson Memorial violated are not penal in nature, we conclude that the trial court did not err in striking Appellants' negligence per se claim. We overrule Appellants' sixth issue.

## VII. FACTUAL SUFFICIENCY

Appellants contend in their seventh issue that the jury's verdict in favor of Watson Memorial was so against the great weight and preponderance of the evidence that it was manifestly unjust.

### A. STANDARD OF REVIEW

In reviewing an issue asserting that an answer is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence, both the evidence that tends to prove the existence of a vital fact as well as evidence that tends to disprove its existence. *Ames v. Ames,* 776 S.W.2d 154, 158–59 (Tex.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). So considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the issue should be sustained, regardless of whether there is some evidence to support it. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### B. DISCUSSION

Watson Memorial argues that Appellants failed to provide any evidence of a proximate causal connection between the alleged breach of duty and Watson's injuries. As we have already discussed, in a medical malpractice case, the proximate causation element must be proven by medical expert testimony, except in limited circumstances in which the mode of treatment is within the experience of a layperson, which is not pled or apparent in this case. *Hood,* 554 S.W.2d at 165–66; *Arguello v. Gutzman,* 838 S.W.2d 583, 587 (Tex.App.—San Antonio 1992, no writ); *Lesser v. St. Elizabeth Hosp.,* 807 S.W.2d 657, 659 (Tex.App.—Beaumont 1991, writ denied); *Kieswetter v. Center Pavilion Hosp.,* 662 S.W.2d 24, 27 (Tex.App.—Houston [1st Dist.] 1983, no writ). In this case, Alford was Appellants' expert witness who testified that the nurses at Watson Memorial breached several standards of care. *See Lesser,* 807 S.W.2d at 659 (explaining that a nurse may be qualified to give testimony about medical causation through specialized experience).

Alford explained that in her opinion, the nurses breached the standard of care with regard to hydration because when Watson went to the hospital he had a blood urea nitrogen ratio (BUN) of 238, while the norm is 7 to 20 or 28. Dr. Cox, Watson's treating physician at Harris Methodist Hospitals emergency room, testified that Watson was suffering from extreme dehydration. Dr. Cox and Dr. William Rhor, the Collin County Medical Examiner, testified that the BUN and creatinine level explain whether the cause of death was dehydration or renal failure. Because the BUN was so much higher than the creatinine level, the cause of death was most likely dehydration. Furthermore, Alford and Cox relied on the fact that Watson's mouth was coated in black and his mucous membranes were dry. Watson Memorial's records also indicated that Watson was supposed to have about 1700 CCs of fluid per day, but Alford testified that she was unable to ascertain how much fluid Watson was actually given. She also concluded that the nurses at the nursing home breached

the standard of care of having an intake and output measurement in regard to Watson's hydration level. Alford concedes that there were indications in Watson's record that he was taking fluids well, but Alford criticized this as not sufficient to establish an intake and output balance to determine whether Watson was hydrated.

Sharon Chapman, the director of nursing at Watson Memorial during Watson's stay, testified that the dietician calculated Watson's required fluid intake at 2,000 CCs daily, which was included in his daily diet. She also testified that Watson received other fluid in the form of 5 ounces of water with his medication three times a day, juice in mid-morning and mid-afternoon, and a pitcher of water by his bedside. If Watson did not drink out of the pitcher during a shift, the next shift would be notified to give him more fluids. Chapman testified that Watson Memorial was unable to give IVs at its facility; therefore, hydration was limited to the previously described methods. Chapman also testified that an independent dietician evaluated Watson three times during his stay at Watson Memorial, monitored his protein and amino status, and adjusted his fluid intake per kilogram of body weight. She also explained that it was not possible to get a correct measurement of fluid output because Watson was incontinent.

Dr. Bernard McGowen, a physician with a specialty in internal medicine, testified that the sepsis Watson developed at Watson Memorial on September 24 could account for the radical dehydration. Sepsis occurs when the gram negative bacteria in the body enters the blood stream and produces an endotoxin that dilates the blood vessels and damages them to the point that fluid begins to leak out of the blood vessels. The body then dehydrates internally because the proteins and parts of the blood that keep it in the vessels leak out causing the blood volume to drop. Dr. McGowen testified that this dehydration cannot be treated by having the patient drink water. Instead, the patient must be given medicine that constricts his blood vessels and high levels of IV fluids. Therefore, Dr. McGowen testified that any failure on Watson Memorial's part to give Watson the recommended level of liquid did not produce the dehydration that occurred.

Alford also testified about the nursing staff's breach of the standard of care relating to the integrity of Watson's skin. Alford explained that because Watson developed bed sores, the standard of care had to have been breached. Alford tempered her testimony by stating that the nursing staff failed to carry out interventions that would have prevented pressure sores from forming. Alford argues that there is evidence in Watson's records that the nursing staff did turn him in order to prevent pressure sores, but "the evidence of the outcome shows that that could not have occurred." Alford also suggested that the nursing staff erred in using an "egg crate mattress" and "sheep skin" in their treatment of Watson because they do not provide the adequate support necessary to prevent the development of pressure sores. Chapman explained, however, that Watson's "Interdisciplinary Care Plan" instructed the nurses to "[c]heck resident status hourly" in order to check his positioning because due to Watson's altered thought processes he kept repositioning himself to his right side. Chapman further explained that the nursing staff was required to use pillows to keep him in the position in which they placed him, but Watson kept removing the pillows. Chapman also testified that the sheep skin and egg crate mattress Alford referred to in her testimony was what Watson arrived at Watson Memorial with from the previous facility. Instead, Watson Memorial used a

gel mattress to relieve the pressure. Chapman also testified that Watson was receiving three showers or whirlpools a week with bed baths on the other days.

Entries in Watson's records also show that he developed about six pressure sores during his stay at Watson Memorial, while Harris Methodist Hospital recorded two additional pressure sores, which Watson Memorial did not discover. Alford also testified that it was a breach of the standard of care to discover one of these ulcers at stage two instead of stage one.

Dr. Cox testified that he observed decubiti, or pressure sores, on Watson's right hip and both heels. It was Chapman's opinion, however, that the only pressure sores Watson had were those he was suffering from when he entered Watson Memorial, the remaining lesions were a result of vascular disease. Bessie Stovall, the assistant director of nurses at Watson Memorial during Watson's stay, testified that decubitus does not necessarily mean a pressure sore because decubitus can also be caused by vascular problems, arterial problems, or skin diseases themselves. Therefore, any indication in Watson's records that he was suffering from decubitus means that he had a wound or lesion, but not that he was being diagnosed with a pressure sore. Dr. Cox, however, testified that these lesions were decubiti, which he defined as only pressure sores; decubiti cannot be vascular lesions. Dr. McGowen clarified the meaning of decubitus by defining it as lesions that develop as a result of pressure; however, he explained that people record lesions in a patient's record as decubitus even when they are not pressure related.

Dr. Cox testified that the pressure sore on Watson's right hip was covered by eschar and was infected and necrotic, in other words it contained dead tissue. Alford also testified that once "eschar," or a "heavy, thick leathery, black cover," appears on the ulcer, medical attention is necessary to remove it. Dr. Cox also explained that Watson was suffering from several decubiti and his right foot was gangrenous to the mid point and the rest of the foot was cyanotic, or blue. Watson was also suffering from a urinary tract infection.

Dr. Cox also testified that one of the causes of death was sepsis. Dr. Rohr testified that the source of the sepsis was most likely caused by the gastrointestinal bacteria in the fecal material entering the decubitus on the right hip. Dr. Rohr relied on the fact that Watson had fecal material smeared over his legs and perineal area as indicated in the Harris Methodist Hospital records. Alford testified that the presence of fecal material on a patient was a breach of the standard of care. However, on cross-examination, Dr. Rohr conceded that the ambulance records from Watson's transport to Harris Methodist Hospital did not mention any fecal material even in recording Watson's decubiti on his buttocks. Dr. Cox testified that the sepsis was probably caused by bacteria growing in the decubiti breaking through into the blood. Dr. McGowan also explained that bacteria may be in a lesion, kidney infection, bladder infection, or boils, and when the tissue where they live is destroyed or broken down they enter the blood system.

Stovall assessed Watson when he entered Watson Memorial. Upon her assessment of Watson, Stovall testified that she found two stage three pressure sores on each heel and redness and excoriation on his buttocks and peritoneal area. Stovall testified that his heels, buttocks, and peritoneal area were improving during his first few days at Watson Memorial. The next evaluation three days later also revealed improvement. Stovall explained that not all the dressings were changed everyday

because some of the medication works through the dressings. For instance, Flexan is a medicated waffle-shaped bandage that is applied to the skin for three continuous days. However, Stovall testified that Watson kept removing his heel pads and bandages.

On a subsequent assessment, Stovall noticed several areas on the right hip, little toe on the right foot, and the side of the foot where unusual lesions began to appear that did not match the description of decubiti. Stovall notified Dr. Toppin and called Appellant Bowling to notify her of the change in condition and asked her to call the doctor. Dr. Toppin assessed Watson and placed him on antibiotics. Stovall testified that at this time she was surprised that Watson was not transported to the hospital, but it was the family's wish for him not to be transferred. Six days later, the toe and the side of the foot were still blue, and the nurses began monitoring Watson every shift. Dr. Toppin was aware of this blue area, but he advised staff just to monitor it. Four days later, the fourth toe on the right foot started turning blue. Stovall contacted Appellant Bowling, and Dr. Toppin ordered an examination by a podiatrist.

The records reflect that the other wounds were improving, except for Watson's right hip, which Dr. Toppin ordered to be treated with Santyl, a debriding agent that removes eschar. Two days later on September 20, 1995, Stovall, Chapman, and Appellant Bowling discussed the possibility of admitting Watson into the hospital. Dr. Toppin was on vacation; however, Dr. Vankantappan was receiving his calls. Dr. Vankantappan issued a directive with Bowling's permission to send Watson back to THC. However, the representative of THC would not permit Watson to be transferred to their hospital because the risk of amputation was too great. Sto-

vall called Dr. Vankantappan who advised her to contact the family and do what they wanted. Stovall contacted Appellant Bowling on September 21, but Bowling indicated that she would wait for Dr. Toppin to return from vacation to talk to him and talk to her family. Dr. Vankantappan then came to assess Watson by conducting a full examination of his wounds. Dr. Vankantappan told Stovall to contact Bowling and do what she wanted, but Appellant Bowling said that she would talk to her family and decide. Stovall never heard from Appellant Bowling again before Watson was transported to the hospital.

Chapman was generally unable to discuss Watson's condition with any of the plaintiffs. It was her understanding from the physician that the plaintiffs did not want Watson sent to the hospital. Instead, Chapman understood the family's position to be that they wanted Watson to stay in the nursing home and receive the care prescribed by the physician. However, Watson's condition was changing during his stay at Watson Memorial. Chapman told Watson's brothers and a sister-in-law that it was difficult to get Watson to eat and his wounds were not improving; therefore, she told them that she would feel more comfortable with him returning to the hospital. Because Chapman was unable to contact Appellants, Watson's brothers indicated that they would communicate this information to Appellants. Appellant Bowling gave Watson Memorial consent to order splints to prevent the ongoing contractures of the lower limbs. However, Watson became combative due to the discomfort of stretching and positioning. Therefore, the family declined using any further splints because they felt the patient had given up and did not want to make him uncomfortable.

Dr. McGowen also explained that the blue tissue on Watson's right hip, little toe

on his right foot, and the area on the side of his right foot can be explained by Watson's atherosclerotic calcification in his upper leg. Emboli, which are cholesterol and calcium plaques that break away from the artery wall, broke away from Watson's atherosclerotic calcification and traveled to other small vessels in the leg and blocked them. Therefore, no blood was able to reach those areas of the body and the tissue started breaking down. This process, coupled with the inability to change position, accounts for pressure sores. This process also accounts for Watson's renal failure, as well, because during sepsis shock, the body shuts off the blood supply to the kidneys. Dr. Rohr's testimony also suggests that the combination of dehydration and athrosclerosis caused the gangrene of Watson's right foot.

Alford also suggested that the nursing staff breached the nutritional standard of care because Watson was not eating, he was receiving supplements, and he had weight loss. She further testified that there was insufficient intervention to solve the problem. However, Stovall testified that if Watson was unable to finish his entire meal, he was given a supplement, which the records indicate he accepted. Furthermore, Chapman testified that upon admission on August 18, 1995, Watson weighed 112 pounds, and by September 20 he weighed 109 pounds. Therefore, Watson only had lost 3 pounds during the majority of his stay at Watson Memorial. The evidence also suggests that the dietician evaluated Watson three times: August 28, September 13, and September 20.

Alford was also concerned about Watson's combativeness. Alford interpreted from his records that Watson would only become uncooperative when the nurses were treating his foot or giving him a bath;

therefore, Alford explained that this combativeness was a sign of discomfort. In response to Alford's concerns about Watson's combativeness, Chapman explained that Watson's records indicated that a previous health facility had placed him on Haldol, which is psychotrophic medication prescribed to him for his combativeness.

Several witnesses also testified about Watson's preexisting medical conditions. Chapman explained during cross examination that Watson entered Watson Memorial with multiple health problems including congestive heart failure, a peripheral vascular disease, several decubiti that had been infected, and a high BUN. Dr. McGowen also explained that Watson had numerous preexisting complications when he entered Watson Memorial, any one of which could have killed him at that time. Specifically, Watson suffered from congestive heart failure, cardiac arrhythmias, atherosclerotic disease, problems related to peripheral vascular disease, renal disease, and infections such as gram negative sepsis. Dr. Rohr also testified that Watson had other medical conditions such as peripheral vascular disease, athro and arterial sclerotic peripheral vascular disease, and congestive heart failure, which he stated could result in Watson's death at any time.

On the face of this record, it is clear that the jury could have believed from the evidence that Watson Memorial did not cause Watson's injuries. Although conflicting inferences could be drawn from the evidence, we are not the fact finder, and we cannot substitute our judgment for that of the jury. Because the evidence supports the jury's verdict, and because the evidence to the contrary is not so overwhelming to make the jury's finding manifestly unjust, we overrule issue seven.[1]

---

1. Watson Memorial raises a cross point in which it argues that because the Appellants

## VII. JURY QUESTION

The following liability question was submitted to the jury: "Did the negligence, if any, of Watson Memorial Nursing Home proximately cause injury leading to the death of James Burnett Watson?" In their first issue, Appellants assert that the trial court erred in failing to submit a jury question asking whether Watson Memorial's negligence proximately caused Watson's injuries that did not lead to death. Watson Memorial retorts that the trial court correctly used broad form questions to instruct the jury because it conditioned two separate damages questions on the same liability question, which Watson Memorial asserts is supported by the Texas Pattern Jury Charges. However, Appellants contend that broad form questions are appropriate only when feasible and do not apply to situations in which plaintiffs allege separate and distinct causes of action requiring different elements of proof. In essence, Appellants argue that the trial court only charged the jury regarding Appellant's wrongful death claim. The jury was not allowed to determine if Watson Memorial's conduct proximately caused Watson's injuries without actually causing his death in accordance with Appellant's survivorship claim.

### A. STANDARD OF REVIEW

We review the jury charge under an abuse of discretion, which occurs only when the trial court acts without reference to any guiding principle. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). To determine whether an alleged error in the jury charge is reversible we must consider the pleadings of the parties, the evidence presented at

did not present any evidence of causation, the trial court erred in refusing to grant Watson Memorial's motion for directed verdict. However, because we have held that the

trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986) (op. on reh'g). Alleged error will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause the rendition of an improper judgment. *Id.*

We must also recognize that there is a presumption in favor of the broad-form submission of questions. TEX.R. CIV. P. 277; *E.B.*, 802 S.W.2d at 649. "Rule 277 mandates broad form submissions 'whenever feasible,' that is, in any or every instance in which it is capable of being accomplished." *E.B.*, 802 S.W.2d at 649.

### B. DISCUSSION

Under the Wrongful Death Act, liability may be predicated only on "an injury that causes an individual's death." TEX. CIV. PRAC. & REM.CODE ANN. § 71.002(b) (Vernon 1997). The Act authorizes claims only for actions that actually cause death. *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 404 (Tex.1993). Unlike the Wrongful Death Act, however, the Survival Statute does not create a new cause of action. Rather, it simply provides:

(a) A cause of action for personal injury to the health, reputation, or person of an injured person does not abate because of the death of the injured person or because of the death of a person liable for the injury.

(b) A personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person.

jury's verdict in favor of Watson Memorial was not manifestly unjust we decline to address the cross point.

The action survives against the liable person and the person's legal representatives.

(c) The suit may be instituted and prosecuted as if the liable person were alive.

TEX. CIV. PRAC. & REM.CODE ANN. § 71.021 (Vernon 1997). In other words, the decedent's cause of action survives his death. *Waters ex rel. Walton v. Del–Ky, Inc.*, 844 S.W.2d 250, 254 (Tex.App.—Dallas 1992, no writ).

 In this case, the same allegations gave rise to both the wrongful death and survival actions. During the course of trial the testimony revolved around dehydration, decubiti, sepsis shock, gangrene, and Watson's preexisting conditions. Therefore, even had the trial court erred in refusing to include a jury instruction to charge the jury on the survival action, from our previous discussion concerning the factual sufficiency of Appellants' evidence we hold that the evidence of causation was insufficient to support a verdict in favor of Appellants on a survival claim. Therefore, we overrule Appellants' first issue.

## VIII. CONCLUSION

Having overruled Appellants' issues on appeal, we affirm the trial court's judgment.

CAYCE, C.J. filed a concurring opinion in which DAUPHINOT, J. joins.

DAUPHINOT, J. filed a dissenting opinion.

CAYCE, Chief Justice, concurring.

 I concur in the result Justice Day reaches, but I write to note my disagreement with his conclusion that the photographs that TDHS investigators had taken of Watson during their investigation of Watson Memorial are confidential and therefore prohibited from disclosure under section 19.2010(a) of the administrative code. I would hold that the photographs do not fall within the category of "report, records, and working papers" protected from disclosure under section 242.127 of the Texas Health and Safety Code. *Cf. Axelson, Inc. v. McIlhany*, 755 S.W.2d 170, 173 (Tex.App.—Amarillo 1988, orig. proceeding) (holding photographs taken by attorney were not protected from disclosure under work product privilege of Rule 166b(3)(a)), *mandamus conditionally granted*, 798 S.W.2d 550 (Tex.1990); *Terry v. Lawrence*, 700 S.W.2d 912, 913 (Tex. 1985, orig.proceeding) (holding photographs taken during insurance investigation are not exempt from discovery under investigative privilege set forth in Rule 166b(3)(d)). Nevertheless, I do not believe that the trial court's refusal to order disclosure of the photographs constitutes reversible error because the photographs are cumulative of other evidence admitted during the trial of the case. In all other respects, I agree with the reasoning Justice Day uses to dispose of the issues in this appeal.

DAUPHINOT, J. joins.

DAUPHINOT, Justice, dissenting.

I agree with Chief Justice Cayce's reasoning in his concurring opinion and respectfully dissent to Justice Day's holding that the photographs of Watson were not discoverable. I further respectfully dissent from the majority's holding that the trial court did not err in failing to submit a jury question asking whether Watson Memorial's negligence proximately caused injury to James Watson. As the majority points out, broad form submission is encouraged.[2] The liability question submit-

---

2. TEX.R. CIV. P. 277; *Tex. Dep't of Human* *Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.

ted, however, was narrowly, rather than broadly, posed.

Appellants' petition included both a wrongful death action and a survival action. Appellants presented evidence in support of both claims. Appellants were, therefore, entitled to have both theories of recovery submitted to the jury.[3] The trial judge, however, limited the liability question to those injuries resulting in death. I do not understand, and the majority does not explain, how this question allowed the jury to return a verdict addressing Watson Memorial's liability for injuries that did not lead to death. We cannot determine whether the jury found there was no injury, no negligence, or no causation. We can only ascertain that the jury did not find the evidence sufficient to support the Appellants' wrongful death claim.

It is well established that wrongful death and survival claims are independent of each other and that no election between the two causes of action is required.[4] Nor, on the other hand, are they mutually exclusive. The majority, however, dismisses Appellants' complaint by saying that even if the trial court erred in refusing to give the requested instruction on the survival action, "from our previous discussion concerning the factual sufficiency of Appellants' evidence [to show wrongful death] we hold that the evidence of causation was insufficient to support a verdict in favor of Appellants on a survival claim." I respectfully disagree with the majority's reasoning.

As the majority correctly points out, our standard of review for determining the factual sufficiency of the evidence to sup-

port the jury's verdict on the wrongful death action is whether the verdict is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust.[5] The majority does not contend that there was insufficient evidence to support submission of the survival action issue. Indeed, there was ample evidence to support such submission. Additionally, in its discussion of the factual sufficiency of the evidence on the wrongful death action, the majority concedes that the outcome turned on the credibility of the witnesses, and not on lack of evidence. The majority upholds the jury's verdict on this issue, not because there was no evidence to support a contrary verdict, but because "the jury could have believed from the evidence that Watson Memorial did not cause Watson's injuries." It is equally likely, however, that the jury found that although some, most, or all of Watson's injuries were caused by the negligence of Watson Memorial, those specific injuries did not lead to Watson's death.

Accordingly, I would hold that the trial court abused its discretion in refusing to submit a jury question on Appellants' survival action. Because there was ample evidence to support submission of such a question and because no finding by the jury explicitly or implicitly held against Appellants on any issue essential to their survival claim, I would reverse the trial court's judgment and remand this case to the trial court on the survival action.

---

1990).

3. Tex.R. Civ. P. 278; *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 718 (Tex.1995).

4. *Gen. Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 924 (Tex.1993).

5. *Watson v. Prewitt,* 159 Tex. 305, 320 S.W.2d 815, 816 (1959); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).