Opinion issued January 8, 2004





     





In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00663-CV




RIDGECREST RETIREMENT & HEALTHCARE D/B/A RIDGECREST
RETIREMENT CENTER, LTD., Appellants

V.

DARLYN JILL URBAN, INDIVIDUALLY, AND AS REPRESENTATIVE
OF THE ESTATE OF DONALD G. MAKER, AND RICHARD J. MAKER,
INDIVIDUALLY, Appellees




On Appeal from the 113th District Court
Harris County, Texas
Trial Court Cause No. 0038099




O P I N I O N
          Plaintiffs/appellees, Darlyn Jill Urban, individually, and as representative of
the estate of Donald G. Maker, and Richard J. Maker, individually, sued
defendant/appellant, Ridgecrest Retirement & Healthcare d/b/a Ridgecrest Retirement
Center, Ltd. (“Ridgecrest”), for negligence in its care of Donald G. Maker (“Maker”). 
A jury returned a verdict awarding $999,999.99 to Maker’s estate, but found that his
children sustained no damages. The trial court entered judgment against Ridgecrest 
and in favor of Maker’s estate in the amount of $999,999.99, plus prejudgment
interest of $169,191.71. We reverse and remand. 
Background
          Maker was a resident of Ridgecrest, an assisted living facility, since 1995.
Before his admission to Ridgecrest, Maker had a multitude of health problems,
including three prior strokes, diabetes, atrial fibrillation, and hypertension. He was
in a wheel chair because of paralysis in his right arm and leg. 
          Because of the atrial fibrillation, Maker was at risk for blood clots. His doctor,
Dr. Jensen, prescribed Coumadin, a blood-thinner medication, to reduce the risk of
another stroke. Coumadin is an anticoagulant that helps prevent clots from forming
and leading to strokes. A test known as Protime monitors the level of Coumadin. A
low Coumadin level indicates a risk of stroke; a high level indicates a risk of bleeding
problems. 
          In early July 1998, Maker developed a urinary tract infection. Dr. Jensen
prescribed the antibiotic Bactrim, which did not cure the infection. On July 27, 1998,
Maker continued to have problems with bowel incontinence. Dr. Jensen changed the
antibiotic prescription to Cipro, which had the side effect of thinning blood. Dr.
Jensen was aware that Cipro had an “enhancement” effect on the Coumadin to thin
Maker’s blood even further. On July 27, Dr. Jensen ordered a Protime test to be run
by Thursday, July 30. 
          The procedures for ordering lab work were as follows: Maker (or whoever
took him to the doctor) would bring the doctor’s order to Ridgecrest. Ridgecrest
would then write that order into a lab book supplied by Physicians’ Reference
Laboratories (“PRL”). As a courtesy to residents, so that they would not have to go
to the lab, Ridgecrest made arrangements for PRL to come to Ridgecrest and take
blood and urine samples from the residents. PRL would come to Ridgecrest, review
the order in the lab book, obtain the specimens needed to run the ordered tests, and
fax a copy of the lab result to Ridgecrest. 
          Prior to this lawsuit being filed, PRL’s lab book disappeared. PRL admitted
that one of its former employees took the lab book. It is unknown why Maker’s
Protime test, which Dr. Jensen ordered to be run on July 30, was not run until July 31. 
PRL performed Maker’s Protime test on Friday, July 31, at 5:00 a.m. 
          A normal blood clotting time is 13-15 seconds. Maker’s Protime test indicated
that his time was 36.4 seconds, which is abnormal. Maker’s results were faxed to
Ridgecrest on Friday, July 31, at 11:58 p.m., two minutes before midnight. The room
where Ridgecrest kept the fax machine was closed at 5 p.m. on Friday for the
remainder of the weekend. Ridgecrest contends that PRL should have faxed the lab
result to Maker’s physician because Ridgecrest did not, and was not required to, have
individuals on staff who were trained to interpret lab results. 
          After the weekend, on Monday, August 3, a Ridgecrest medication aide, Edith
Dukes, saw Maker’s abnormal lab report. She faxed the results to Dr. Jensen at 8:29
a.m. that morning. Upon receipt of the abnormal result, Dr. Jensen instructed
Ridgecrest to stop administering the Coumadin to Maker and inject vitamin K, which
is designed to thicken the blood. Dr. Jensen did not request that Ridgecrest bring
Maker to the hospital. He expected that Maker’s Protime result would return to
normal within one or two days. 
          Pursuant to Dr. Jensen’s orders, Maker did not receive any more Coumadin and
instead received the vitamin K injection. Ms. Owenby, the director of assisted living
at Ridgecrest, testified that Maker was fine on August 3. He did not appear to be
bleeding, dizzy, confused, or disoriented. 
          In the early morning of Tuesday, August 4, Maker was found on the floor. He
was incontinent of urine and bowel. Later that morning, Maker began to experience
difficulty breathing. Ridgecrest called Maker’s son and Dr. Jensen, who ordered him
transferred to the hospital. The emergency room assessed Maker’s condition as non-urgent. The emergency room records indicate that Maker denied being in any pain. 
At the time of his admission, Maker’s blood pressure was adequate. At 3:30 p.m., he
was given a blood transfusion. That evening on Tuesday, August 4, at approximately
7:55 p.m., Maker died. 
          The cause of death listed on Maker’s death certificate was “CVA,” or
cerebrovascular accident or stroke. Dr. Jensen agreed with the cause of death,
opining that Maker did not begin bleeding until the morning of Tuesday, August 4. 
Dr. Krouse, one of Maker’s experts, disagreed, and instead opined that Maker bled
to death. Dr. Krouse testified that Maker had an overdose of Coumadin from July 31
to August 4, which resulted in Maker bleeding internally for a few days before his
admission to the hospital. 
Procedural History
          Maker’s children, individually and as representatives of Maker’s estate, sued
Ridgecrest and PRL for negligence. Ridgecrest filed a cross action against PRL for
contribution. The allegations of negligence were that Ridgecrest did not have lab
work performed in a timely fashion, did not forward an abnormal test result to
Maker’s physician, and violated multiple provisions of the Texas Administrative
Code pertaining to assisted living facilities. Ridgecrest’s claim against PRL for
contribution was based on an agreement and PRL’s course of performance to forward
lab results directly to the residents’ physicians. 
          Before the introduction of any evidence, plaintiffs announced that they had
settled with PRL and dropped all claims against PRL. The trial court proceeded with
plaintiffs’ claims against Ridgecrest, and Ridgecrest continued to maintain its cross
action against PRL. The jury returned a verdict awarding $999,999.99 to Maker’s
estate and no damages to Maker’s children. The jury allocated 100% of the fault
against Ridgecrest and none against PRL. The trial court entered judgment against
Ridgecrest and in favor of Maker’s estate in the amount of $999,999.99, plus
prejudgment interest of $169,191.71. The court denied recovery to Maker’s children
in their individual capacities and denied Ridgecrest’s claim for contribution from
PRL. 
          In nine issues, Ridgecrest contends as follows: (1) the trial court erred in
excluding Defense Exhibit 2 because it established that PRL had a policy to fax lab
results directly to residents’ physicians; (2) the trial court erred in excluding the
testimony of Ms. Huntsman, a Ridgecrest administrator, and in granting a limiting
instruction regarding her testimony; (3) Dr. Jay Luxenberg was not qualified to render
an expert opinion; (4) Barbara Acello was not qualified to render an expert opinion;
(5) Cheryl Staats was not qualified to render an expert opinion; (6) the evidence was
legally and factually insufficient to support the jury’s finding of negligence; (7) the
evidence was legally and factually insufficient to support the jury’s award of
$999,999.99 for pain and mental anguish and funeral and burial expenses; (8) the trial
court erred in submitting a negligence per-se instruction; and (9) the trial court erred
in submitting a spoilation instruction. 
Negligence Per-Se Instruction
          In its eighth issue, Ridgecrest contends that the trial court erred in submitting
a negligence per-se instruction.
          Question 1 of the jury charge asked whether Ridgecrest was negligent. The
charge included the following Texas Administrative Code sections:
Section 92.2(3)(B):
 
(B) The personal care facility shall meet other basic and primary needs
of the residents. Residents may require at least one or more of the
following needs, while some residents may require all of the following
needs:
 
(i) assistance with meals, dressing, movement, bathing, or other
personal needs or maintenance;
 
(ii) the administration of medication by a person licensed to
administer medication or the assistance with or supervision of
medication; or
 
(iii) general supervision or oversight of the physical and mental
well-being of a person who needs assistance to maintain a private
and independent residence in the facility or who needs assistance
to manage his personal life, regardless of whether a guardian has
been appointed for the person. 
 
Section 92.2(3)(c):
 
(c) Residents whose needs cannot be met by the personal care facility,
or the necessary services secured by the resident, shall not be admitted
or retained in the facility. When services beyond assistance are needed,
the decision that such services can be provided or secured shall be the
responsibility of facility management with written concurrence of the
resident, resident’s attending physician, and/or responsible party. This
concurrence shall be placed in the facility file. Refer to the accident,
injury, or acute illness provisions in § 92.41(f) of this title (relating to
Standards for Personal Care Facilities).
 
Section 92.2(5)(A):
 
(5) Personal care has at least two basic elements.
 
                    (A) The delivery of services requires the presence of a
facility staff member.
 
(B) The services performed are of a protective or safeguard nature
in efforts to maintain or restore basic health, safety, and well-being of the residents.
 
Section 92.41(a)(2)(A):
 
(2) Attendants.
 
(A) There shall be an attendant in the facility at all times when
residents are in the facility. Additionally, there shall be other
attendant personnel as needed to:
 
(i) maintain order, safety, and cleanliness;
 
(ii) assist with medication regimens;
 
(iii) prepare and service meals;
 
(iv) assist with laundry; and
 
(v) assure that each resident receives the kind and amount
of supervision and care required to meet his basic needs. 
 
Section 92.41(e):
 
(e) Medications.
 
(1) Administration.
 
(A) Residents who choose not to or cannot self-administer
their medications must have their medications administered
by a person who:
 
(i) holds a current license under state law which
authorizes the licensee to administer medication; or 
 
(ii) holds a current medication aide permit and acts
under the authority of a person who holds a current
license under state law which authorizes the licensee
to administer medication. 
 
(B) All resident’s prescribed medication shall be dispensed
through a pharmacy or by the residents’s treating physician
or dentist.
 
(C) Physician sample medications may be given to a
resident by the facility provided the medication has specific
dosage instructions for the individual resident.
 
(D) Each resident’s medications shall be listed on an
individual resident’s medication profile record. The
recorded information obtained from the prescription label
shall include, but is not limited to, the medication name,
strength, dosage, amount received, directions for use, route
of administration, prescription number, pharmacy name,
and the date each mediation was issued by the pharmacy. 
 
(2) Supervision. Supervision of a resident’s medication regimen
by facility staff may be provided to residents who are incapable
of self-administering to include and limited to:
 
(A) reminders to take their medications at the prescribed
time;
 
(B) opening containers or packages and replacing lids;
 
(C) pouring prescribed dosage according to mediation
profile record;
 
(D) returning medications to the proper locked areas;
 
(E) obtaining medications from a pharmacy; and 
 
(F) listing on a individual resident’s medication profile
record the medication name, strength dosage, amount
received, directions for use, route of administration,
prescription number, pharmacy name, and the date each
mediation was issued by the pharmacy. 
 
Section 92.41(f):
 
(f) Accident, injury, or acute illness.
 
(1) In the event of accident or injury requiring emergency
medical, dental, or nursing care, or in the event of apparent death,
the personal care facility will:
 
(A) make arrangements for emergency care and/or transfer
to an appropriate place for treatment (i.e., physician’s
office, clinic, hospital, etc.);
 
(B) immediately notify the resident’s physician and next of
kin, responsible party, or agency who placed the resident
in the facility; and
 
(C) describe and document the injury, accident, or illness
on a separate report. The report shall contain a statement
of final disposition and be maintained on file. 
          After these code provisions, the jury charge included a negligence per-se
instruction, which stated, “A failure to comply with these regulations may be
negligence in itself.”


 Ridgecrest objected to the instruction before the trial court
submitted the charge to the jury. 
          Negligence per se is a common-law doctrine in which a duty is imposed based
on a standard of conduct created by a penal statute rather than on the reasonably
prudent person test used in pure negligence claims. Smith v. Merritt, 940 S.W.2d
602, 607 (Tex. 1997). The threshold questions in every negligence per-se case are
whether the plaintiff belongs to the class that the statute was intended to protect and
whether the plaintiff’s injury is of a type that the statute was designed to prevent. 
Perry v. S.N., 973 S.W.2d 301, 305 (Tex. 1998). 
          A violation of a non-penal administrative code statute does not establish a
negligence per-se claim. For example, in Pack v. Crossroads, Inc., 53 S.W.3d 492
(Tex. App.—Fort Worth 2001, pet. denied), the negligence per-se claim involved
alleged breaches of title 40, chapter 19 of the Texas Administrative Code, which
applies to a nursing home’s licensure and participation in the Medicaid program.


 
Id. at 509. The penalties for enforcement of title 40, chapter 19 are civil remedies,
ranging from a warning letter of noncompliance to license revocation to
administrative penalties. Id. at 509-10. The Pack court held that the administrative
code provisions were not penal in nature; thus, the trial court properly struck the
negligence per-se claim. Id. at 510. 
          In response, Maker contends that the negligence per-se instruction “was
redundant because it merely restated the standard of ordinary care and did not alter
the common law duty which was included in the broad form submission of the
negligence question.” Maker relies on Smith v. Central Freight Lines, Inc., 774
S.W.2d 411 (Tex. App.—Houston [14th Dist.] 1989, writ denied), which involved a
suit for personal injuries arising out of a rear-end collision. Smith addressed the
violation of a Texas Transportation Code section involving the driver of a motor
vehicle maintaining an assured clear distance when following another vehicle. Id. at
412 (citing Tex. Rev. Civ. Stat. Ann. art. 6701d, § 61(a) (Vernon 1977)). The
Smith court referred to a commentary to section 5.01 of the Texas Pattern Jury
Charge, which states that “[a] few negligence per se standards found in statutes or
regulations have been held simply to restate the standard of ‘ordinary care’ and not
to alter the duty that already exists at common law.” Id. at 415 (citing 1 State Bar
of Texas, Texas Pattern Jury Charges PJC 5.01 (1987)). The court held that it
is “redundant to submit a question on the statutory standard or to instruct the jury
regarding it, and the negligence per se standard is subsumed under the broad-form
negligence question.” Id. 
          We conclude that Smith is distinguishable, however, because it dealt with a
Transportation Code section. The Administrative Code chapter 92, the provision at
issue in this case, is instead similar to the Administrative Code chapter 19 in Pack. 
Likewise, the penalties for enforcement of chapter 92 are civil remedies, such as
revoking a license or referring a facility to the attorney general for the assessment of
civil penalties. 40 Tex. Admin. Code § 92.153, 92.156. We conclude that these
Administrative Code provisions are not penal in nature; therefore, the negligence per-se instruction was improper. See Pack, 53 S.W.3d at 510. Accordingly, we hold that
the trial court erred in submitting the negligence per-se instruction. 
          We now turn to whether the error was harmful. In Crown Life Ins. Co. v.
Casteel, the supreme court held, “When a trial court submits a single broad-form
liability question incorporating multiple theories of liability, the error is harmful and
a new trial is required when the appellate court cannot determine whether the jury
based its verdict on an improperly submitted invalid theory.” 22 S.W.3d 378, 388
(Tex. 2000). In this case, the negligence per-se instruction, an invalid theory, was
improperly submitted in the broad form question along with negligence, a valid
theory. As in Casteel, we cannot determine whether the jury based its verdict on the
improperly submitted theory. See id. Thus, we hold that the error was harmful and
a new trial is required. See id. 
          We sustain the eighth issue. 
          Because of our disposition of the eighth issue, we need not address the
remaining issues and decline to do so.
Conclusion
          We reverse the judgment of the trial court and remand the cause for a new trial.


                                                             Adele Hedges



                                                             Justice
 
Panel consists of Justices Alcala, Higley, and Hedges.