**RIDGECREST RETIREMENT & HEALTHCARE d/b/a Ridgecrest Retirement Center, Ltd., Appellants**

v.

**Darlyn Jill URBAN, Individually, and as Representative of the Estate of Donald G. Maker, and Richard J. Maker, Individually, Appellees.**

No. 01–02–00663–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 8, 2004.

Rehearing Overruled Feb. 6, 2004.

Charlotte A. Fields, Ronald E. Tigner, Preis, Kraft & Roy, Houston, TX, Kevin L. Wentz, Wentz & Zavarelli, Irving, TX, David Criss, Dallas, TX, for Appellant.

Steven G. Ohrvall, Richard L. Howell, Demarest, Smith, Giunta & Howell, P.L.L.C., Dallas, TX, Steve Stewart, Levin & Kasner, Houston, TX, for Appellee.

Panel consists of Justices ALCALA, HIGLEY, and ADELE HEDGES*.

## OPINION

ADELE HEDGES, Justice (Assigned).

Plaintiffs/appellees, Darlyn Jill Urban, individually, and as representative of the estate of Donald G. Maker, and Richard J. Maker, individually, sued defendant/appellant, Ridgecrest Retirement & Healthcare d/b/a Ridgecrest Retirement Center, Ltd. ("Ridgecrest"), for negligence in its care of Donald G. Maker ("Maker"). A jury returned a verdict awarding $999,999.99 to Maker's estate, but found that his children sustained no damages. The trial court entered judgment against Ridgecrest and in favor of Maker's estate in the amount of $999,999.99, plus prejudgment interest of $169,191.71. We reverse and remand.

### Background

Maker was a resident of Ridgecrest, an assisted living facility, since 1995. Before his admission to Ridgecrest, Maker had a multitude of health problems, including three prior strokes, diabetes, atrial fibrillation, and hypertension. He was in a wheel

---

* The Honorable Adele Hedges, who became Chief Justice of the Fourteenth Court of Appeals on December 8, 2003, continues to participate by assignment for the disposition of this case, which was submitted on December 15, 2003.

chair because of paralysis in his right arm and leg.

Because of the atrial fibrillation, Maker was at risk for blood clots. His doctor, Dr. Jensen, prescribed Coumadin, a blood-thinner medication, to reduce the risk of another stroke. Coumadin is an anticoagulant that helps prevent clots from forming and leading to strokes. A test known as Protime monitors the level of Coumadin. A low Coumadin level indicates a risk of stroke; a high level indicates a risk of bleeding problems.

In early July 1998, Maker developed a urinary tract infection. Dr. Jensen prescribed the antibiotic Bactrim, which did not cure the infection. On July 27, 1998, Maker continued to have problems with bowel incontinence. Dr. Jensen changed the antibiotic prescription to Cipro, which had the side effect of thinning blood. Dr. Jensen was aware that Cipro had an "enhancement" effect on the Coumadin to thin Maker's blood even further. On July 27, Dr. Jensen ordered a Protime test to be run by Thursday, July 30.

The procedures for ordering lab work were as follows: Maker (or whoever took him to the doctor) would bring the doctor's order to Ridgecrest. Ridgecrest would then write that order into a lab book supplied by Physicians' Reference Laboratories ("PRL"). As a courtesy to residents, so that they would not have to go to the lab, Ridgecrest made arrangements for PRL to come to Ridgecrest and take blood and urine samples from the residents. PRL would come to Ridgecrest, review the order in the lab book, obtain the specimens needed to run the ordered tests, and fax a copy of the lab result to Ridgecrest.

Prior to this lawsuit being filed, PRL's lab book disappeared. PRL admitted that one of its former employees took the lab book. It is unknown why Maker's Protime test, which Dr. Jensen ordered to be run on July 30, was not run until July 31.

PRL performed Maker's Protime test on Friday, July 31, at 5:00 a.m.

A normal blood clotting time is 13–15 seconds. Maker's Protime test indicated that his time was 36.4 seconds, which is abnormal. Maker's results were faxed to Ridgecrest on Friday, July 31, at 11:58 p.m., two minutes before midnight. The room where Ridgecrest kept the fax machine was closed at 5 p.m. on Friday for the remainder of the weekend. Ridgecrest contends that PRL should have faxed the lab result to Maker's physician because Ridgecrest did not, and was not required to, have individuals on staff who were trained to interpret lab results.

After the weekend, on Monday, August 3, a Ridgecrest medication aide, Edith Dukes, saw Maker's abnormal lab report. She faxed the results to Dr. Jensen at 8:29 a.m. that morning. Upon receipt of the abnormal result, Dr. Jensen instructed Ridgecrest to stop administering the Coumadin to Maker and inject vitamin K, which is designed to thicken the blood. Dr. Jensen did not request that Ridgecrest bring Maker to the hospital. He expected that Maker's Protime result would return to normal within one or two days.

Pursuant to Dr. Jensen's orders, Maker did not receive any more Coumadin and instead received the vitamin K injection. Ms. Owenby, the director of assisted living at Ridgecrest, testified that Maker was fine on August 3. He did not appear to be bleeding, dizzy, confused, or disoriented.

In the early morning of Tuesday, August 4, Maker was found on the floor. He was incontinent of urine and bowel. Later that morning, Maker began to experience difficulty breathing. Ridgecrest called Maker's son and Dr. Jensen, who ordered him transferred to the hospital. The emergency room assessed Maker's condition as non-urgent. The emergency room records indicate that Maker denied being in any

pain. At the time of his admission, Maker's blood pressure was adequate. At 3:30 p.m., he was given a blood transfusion. That evening on Tuesday, August 4, at approximately 7:55 p.m., Maker died.

The cause of death listed on Maker's death certificate was "CVA," or cerebrovascular accident or stroke. Dr. Jensen agreed with the cause of death, opining that Maker did not begin bleeding until the morning of Tuesday, August 4. Dr. Krouse, one of Maker's experts, disagreed, and instead opined that Maker bled to death. Dr. Krouse testified that Maker had an overdose of Coumadin from July 31 to August 4, which resulted in Maker bleeding internally for a few days before his admission to the hospital.

## Procedural History

Maker's children, individually and as representatives of Maker's estate, sued Ridgecrest and PRL for negligence. Ridgecrest filed a cross action against PRL for contribution. The allegations of negligence were that Ridgecrest did not have lab work performed in a timely fashion, did not forward an abnormal test result to Maker's physician, and violated multiple provisions of the Texas Administrative Code pertaining to assisted living facilities. Ridgecrest's claim against PRL for contribution was based on an agreement and PRL's course of performance to forward lab results directly to the residents' physicians.

Before the introduction of any evidence, plaintiffs announced that they had settled with PRL and dropped all claims against PRL. The trial court proceeded with plaintiffs' claims against Ridgecrest, and Ridgecrest continued to maintain its cross action against PRL. The jury returned a verdict awarding $999,999.99 to Maker's estate and no damages to Maker's children. The jury allocated 100% of the fault against Ridgecrest and none against PRL. The

trial court entered judgment against Ridgecrest and in favor of Maker's estate in the amount of $999,999.99, plus prejudgment interest of $169,191.71. The court denied recovery to Maker's children in their individual capacities and denied Ridgecrest's claim for contribution from PRL.

In nine issues, Ridgecrest contends as follows: (1) the trial court erred in excluding Defense Exhibit 2 because it established that PRL had a policy to fax lab results directly to residents' physicians; (2) the trial court erred in excluding the testimony of Ms. Huntsman, a Ridgecrest administrator, and in granting a limiting instruction regarding her testimony; (3) Dr. Jay Luxenberg was not qualified to render an expert opinion; (4) Barbara Acello was not qualified to render an expert opinion; (5) Cheryl Staats was not qualified to render an expert opinion; (6) the evidence was legally and factually insufficient to support the jury's finding of negligence; (7) the evidence was legally and factually insufficient to support the jury's award of $999,999.99 for pain and mental anguish and funeral and burial expenses; (8) the trial court erred in submitting a negligence per-se instruction; and (9) the trial court erred in submitting a spoliation instruction.

## Negligence Per–Se Instruction

■ In its eighth issue, Ridgecrest contends that the trial court erred in submitting a negligence per-se instruction.

Question 1 of the jury charge asked whether Ridgecrest was negligent. The charge included the following Texas Administrative Code sections:

Section 92.2(3)(B):

(B) The personal care facility shall meet other basic and primary needs of the residents. Residents may require at least one or more of the following needs,

while some residents may require all of the following needs:

(i) assistance with meals, dressing, movement, bathing, or other personal needs or maintenance;

(ii) the administration of medication by a person licensed to administer medication or the assistance with or supervision of medication; or

(iii) general supervision or oversight of the physical and mental well-being of a person who needs assistance to maintain a private and independent residence in the facility or who needs assistance to manage his personal life, regardless of whether a guardian has been appointed for the person.

Section 92.2(3)(c):

(c) Residents whose needs cannot be met by the personal care facility, or the necessary services secured by the resident, shall not be admitted or retained in the facility. When services beyond assistance are needed, the decision that such services can be provided or secured shall be the responsibility of facility management with written concurrence of the resident, resident's attending physician, and/or responsible party. This concurrence shall be placed in the facility file. Refer to the accident, injury, or acute illness provisions in § 92.41(f) of this title (relating to Standards for Personal Care Facilities).

Section 92.2(5)(A):

(5) Personal care has at least two basic elements.

(A) The delivery of services requires the presence of a facility staff member.

(B) The services performed are of a protective or safeguard nature in efforts to maintain or restore basic health, safety, and well-being of the residents.

Section 92.41(a)(2)(A):

(2) Attendants.

(A) There shall be an attendant in the facility at all times when residents are in the facility. Additionally, there shall be other attendant personnel as needed to:

(i) maintain order, safety, and cleanliness;

(ii) assist with medication regimens;

(iii) prepare and service meals;

(iv) assist with laundry; and

(v) assure that each resident receives the kind and amount of supervision and care required to meet his basic needs.

Section 92.41(e):

(e) Medications.

(1) Administration.

(A) Residents who choose not to or cannot self-administer their medications must have their medications administered by a person who:

(i) holds a current license under state law which authorizes the licensee to administer medication; or

(ii) holds a current medication aide permit and acts under the authority of a person who holds a current license under state law which authorizes the licensee to administer medication.

(B) All resident's prescribed medication shall be dispensed through a pharmacy or by the residents's treating physician or dentist.

(C) Physician sample medications may be given to a resident by the facility provided the medication has specific dosage instructions for the individual resident.

(D) Each resident's medications shall be listed on an individual resident's medication profile record. The recorded information obtained from the prescription label shall include, but is not limited to, the medication name, strength, dosage, amount received, directions for use, route of administration, prescription number, pharmacy

name, and the date each mediation was issued by the pharmacy.

(2) Supervision. Supervision of a resident's medication regimen by facility staff may be provided to residents who are incapable of self-administering to include and limited to:

(A) reminders to take their medications at the prescribed time;

(B) opening containers or packages and replacing lids;

(C) pouring prescribed dosage according to mediation profile record;

(D) returning medications to the proper locked areas;

(E) obtaining medications from a pharmacy; and

(F) listing on a individual resident's medication profile record the medication name, strength dosage, amount received, directions for use, route of administration, prescription number, pharmacy name, and the date each mediation was issued by the pharmacy.

Section 92.41(f):

(f) Accident, injury, or acute illness.

(1) In the event of accident or injury requiring emergency medical, dental, or nursing care, or in the event of apparent death, the personal care facility will:

(A) make arrangements for emergency care and/or transfer to an appropriate place for treatment (i.e., physician's office, clinic, hospital, etc.);

(B) immediately notify the resident's physician and next of kin, responsible party, or agency who placed the resident in the facility; and

(C) describe and document the injury, accident, or illness on a separate report. The report shall contain a statement of final disposition and be maintained on file.

After these code provisions, the jury charge included a negligence per-se instruction, which stated, "A failure to comply with these regulations may be negligence in itself."[1] Ridgecrest objected to the instruction before the trial court submitted the charge to the jury.

 Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims. *Smith v. Merritt,* 940 S.W.2d 602, 607 (Tex.1997). The threshold questions in every negligence per-se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Perry v. S.N.,* 973 S.W.2d 301, 305 (Tex.1998).

 A violation of a non-penal administrative code statute does not establish a negligence per-se claim. For example, in *Pack v. Crossroads, Inc.,* 53 S.W.3d 492 (Tex.App.-Fort Worth 2001, pet. denied), the negligence per-se claim involved alleged breaches of title 40, chapter 19 of the Texas Administrative Code, which applies to a nursing home's licensure and participation in the Medicaid program.[2] *Id.* at

---

**1.** Maker contends that the charge was not a negligence per-se instruction because of the word "may." We disagree. The charge erroneously instructed the jury that it could find Ridgecrest negligent for any of the failures to abide by the Texas Administrative Code.

**2.** The Pack case involved section 19.1(b), which states:

Scope. The Nursing Facility Requirements for Licensure and Medicaid Certification contain the requirements that an institution must meet in order to be licensed as a nursing facility and also to qualify to participate in the Medicaid program. The requirements serve as a basis for survey activities for licensure and certification.

509. The penalties for enforcement of title 40, chapter 19 are civil remedies, ranging from a warning letter of noncompliance to license revocation to administrative penalties. *Id.* at 509–10. The *Pack* court held that the administrative code provisions were not penal in nature; thus, the trial court properly struck the negligence per-se claim. *Id.* at 510.

In response, Maker contends that the negligence per-se instruction "was redundant because it merely restated the standard of ordinary care and did not alter the common law duty which was included in the broad form submission of the negligence question." Maker relies on *Smith v. Central Freight Lines, Inc.*, 774 S.W.2d 411 (Tex.App.-Houston [14th Dist.] 1989, writ denied), which involved a suit for personal injuries arising out of a rear-end collision. *Smith* addressed the violation of a Texas Transportation Code section involving the driver of a motor vehicle maintaining an assured clear distance when following another vehicle. *Id.* at 412 (citing Tex.Rev.Civ. Stat. Ann. art. 6701d, § 61(a) (Vernon 1977)). The *Smith* court referred to a commentary to section 5.01 of the Texas Pattern Jury Charge, which states that "[a] few negligence per se standards found in statutes or regulations have been held simply to restate the standard of 'ordinary care' and not to alter the duty that already exists at common law." *Id.* at 415 (citing 1 State Bar of Texas, Texas Pattern Jury Charges PJC 5.01 (1987)). The court held that it is "redundant to submit a question on the statutory standard or to instruct the jury regarding it, and the negligence per se standard is subsumed under the broad-form negligence question." *Id.*

We conclude that *Smith* is distinguishable, however, because it dealt with a Transportation Code section. The Administrative Code chapter 92, the provision at issue in this case, is instead similar to the Administrative Code chapter 19 in *Pack.* Likewise, the penalties for enforcement of chapter 92 are civil remedies, such as revoking a license or referring a facility to the attorney general for the assessment of civil penalties. 40 Tex. Admin. Code § 92.153, 92.156. We conclude that these Administrative Code provisions are not penal in nature; therefore, the negligence per-se instruction was improper. *See Pack,* 53 S.W.3d at 510. Accordingly, we hold that the trial court erred in submitting the negligence per-se instruction.

■ We now turn to whether the error was harmful. In *Crown Life Ins. Co. v. Casteel,* the supreme court held, "When a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." 22 S.W.3d 378, 388 (Tex.2000). In this case, the negligence per-se instruction, an invalid theory, was improperly submitted in the broad form question along with negligence, a valid theory. As in *Casteel,* we cannot determine whether the jury based its verdict on the improperly submitted theory. *See id.* Thus, we hold that the error was harmful and a new trial is required. *See id.*

We sustain the eighth issue.

Because of our disposition of the eighth issue, we need not address the remaining issues and decline to do so.

40 Tex. Admin. Code § 19.1(b) (1997). This case involves section 92.2(b), which states:

 Scope. The licensing standards for assisted living facilities contain the minimum standards that a facility must meet in order to be licensed as an assisted living facility. The standard serves as a basis for survey activities for licensure.

 40 Tex. Admin. Code § 92.2(b).

**764**

## Conclusion

We reverse the judgment of the trial court and remand the cause for a new trial.