

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00363-CV

———————————————————

JUSTIN I ENTERPRISES, LLC D/B/A LONGMEADOW HEALTHCARE
CENTER, Appellant

V.

KATY GIERCZAK, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF
JOSEPHINE CHATMAN, Appellee

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 23-10936-431

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

### I. Introduction

This is an interlocutory appeal from the trial court's denial of a motion to dismiss a health care liability claim brought by Appellee Katy Gierczak, individually and on behalf of the Estate of Josephine Chatman. Appellant Justin I Enterprises, LLC d/b/a Longmeadow Healthcare Center (Longmeadow) raises one issue, arguing that Appellee's failure to file an expert report that meets the requirements of the Texas Medical Liability Act (MLA) requires dismissal of the health care liability claim and that the trial court erred when it denied Longmeadow's motion to dismiss. Longmeadow's challenge to the expert report is narrow; it claims that the report is deficient because the expert who authored it provided only conclusory statements that he was qualified to opine on the standard of care. We disagree. The report provides enough specific factual information to show that the expert was qualified to opine that he was familiar with the applicable standard of care. Accordingly, we affirm the trial court's denial of Longmeadow's motion to dismiss.

### II. Factual and Procedural Background

Appellee brought suit against Longmeadow in both her individual capacity and on behalf of the estate of Ms. Chatman, her mother. Appellee's petition alleged that Ms. Chatman was admitted to Longmeadow "to assist [her] with her activities of daily living" and that at the time she resided at Longmeadow, she suffered from a host of comorbidities, including dementia. Knowing of these comorbidities, Longmeadow

2

formulated a care plan for Ms. Chatman and indicated that it was equipped both to meet her needs and to provide appropriate care. Longmeadow's alleged failure to provide Ms. Chatman appropriate care and monitoring led to falls that caused closed-head injuries, contusions, malnutrition, and ultimately Ms. Chatman's death. Appellee claimed that Longmeadow's agents were negligent in Ms. Chatman's care by (1) failing to observe, intervene, and provide care; (2) allowing her to suffer falls; and (3) failing to provide reasonable medical and nursing care. The petition alleged that Longmeadow was vicariously liable for the acts of its agents and had failed to train and supervise its staff. The petition also alleged a number of corporate-negligence acts by Longmeadow, as well as gross negligence.

As required for a health care liability claim, Appellee served an expert report, which was authored by Marty Lee Schmidt, a medical doctor. The report listed Dr. Schmidt's qualifications and focused on breaches of the standard of care and causation that were related to but had not been specified in the petition. In essence, the report focused on Longmeadow's failure to address how Ms. Chatman's diagnosis of dementia increased her risk of wandering. The report stated that this risk should have been addressed by placing Ms. Chatman in a room closer to the nursing station and by having nursing staff monitor her in fifteen-minute intervals. Because of these failures, Dr. Schmidt concluded that Ms. Chatman had suffered injuries when she was allowed to wander into the room of another patient who was potentially aggressive.

Dr. Schmidt opined that it was within a reasonable degree of medical probability that Ms. Chatman suffered injuries because of an assault by another patient.

Longmeadow objected to Dr. Schmidt's report and moved to dismiss Appellee's claim because of a deficiency in the report. The objection asserted that the report failed to show that Dr. Schmidt was a qualified expert to opine on nursing-home practices. Specifically, the objection stated that "to be qualified as an expert under [the MLA], [D]r. Schmidt was required to demonstrate in his report and curriculum vitae that he has experience or training [that] qualifies him to discuss the applicable standard of care for nursing homes." The objection then went on to specify why the report and the curriculum vitae, which was attached to the report, had failed to demonstrate that Dr. Schmidt had the required experience or training to opine on the matters in his report. Appellee, in turn, responded and defended Dr. Schmidt's report from the objection that the report had failed to demonstrate his qualifications to opine on the standard of care.

The trial court heard argument on the objection and then signed an order that recited the following:

> After a hearing and consideration of the pleadings, the evidence, and the arguments of counsel, the [c]ourt finds that [Appellee's] expert report constitutes a qualified and objective good[-]faith effort to show that [Appellee's] claims have merit in compliance with [the MLA]. The [c]ourt finds that [Longmeadow's] objections to the expert report of Dr. Schmidt, MD should be overruled.

Longmeadow then filed this interlocutory appeal.

4

## III. Analysis

### A. We set forth the applicable standard of review.

We apply an abuse-of-discretion standard to test the trial court's decision to grant or deny a motion to dismiss that challenges the adequacy of an expert report required by the MLA. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018).[1]

### B. We set forth the MLA's general principles that govern an expert report.

"Chapter 74 of the Civil Practice and Remedies Code, also known as the [MLA], requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed." *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). When a report is "found deficient," the trial court may grant a thirty-day extension "to cure the deficiency." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

"If the claimant fails to clear this substantive hurdle [of filing an adequate expert report], the trial court must dismiss the suit with prejudice and award reasonable attorney's fees and costs to the affected defendant." *E.D. ex rel. B.O. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b)). The expert-report requirement functions "to weed out

---

[1]As noted above, due to the narrow challenge to the expert report, our review of the adequacy of the report is limited solely to whether Dr. Schmidt is qualified to opine on the standard of care.

frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223.

> The MLA requires an expert report to
>
> provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care[;] the manner in which the care rendered by the . . . health care provider failed to meet the standards[;] and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

The test applied by the trial court in determining the sufficiency of the report is one of objective good faith. *Id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply with the definition of an expert report in Subsection (r)(6)."). The Texas Supreme Court has held that a good-faith effort occurs when a report "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Abshire*, 563 S.W.3d at 223 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)).

Various general principles guide the determination of whether an expert report is sufficient. "A report 'need not marshal all the claimant's proof,' but 'a report that merely states the expert's conclusions about the standard of care, breach, and causation' is insufficient." *Id.* (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878–79 (Tex. 2001)). Nor does a report have to meet the standards of

summary-judgment evidence. *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 517 (Tex. 2017) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 556 n.60 (Tex. 2011))). Also, an expert report need not convince the reader that its conclusions are reasonable. *See Abshire*, 563 S.W.3d at 226 (stating that at the "preliminary [expert-report] stage, whether th[e] standards [referenced in the report] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort" (quoting *Miller*, 536 S.W.3d at 516–17)).

A report need not be sufficient concerning every theory of liability it addresses. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). Succinctly, the Texas Supreme Court has held that a report that satisfies the requirements, "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.*

**C.    We set forth what a report must state to demonstrate that its author is qualified.**

Simply, the section of the MLA that specifies the need for and the criteria of an "expert report" provides that the report "means a written report by an expert." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). The section then breaks down what the term "expert" means and provides in relevant part,

> (B) with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care,

7

an expert qualified to testify under the requirements of Section 74.402; [or]

> (C) with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence[.]

*Id.* § 74.351(r)(5)(B)–(C).

Section 74.402, which is referenced within the subsection specifying the meaning of the term "expert," provides guidance on when "a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care." *Id.* § 74.402(b). A person qualifies "only if the person"

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;[2]

> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b)(1)–(3).

Then, Section 74.402 goes on to specify that

> [i]n determining whether a witness is qualified on the basis of training or experience, the court shall consider whether . . . the witness[]

---

[2]This subsection does not apply to our facts because Dr. Schmidt is not opining on the acts of an individual.

8

(1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c).[3]

The combined effect of these provisions means that experts are not rigidly categorized by the MLA, i.e., the MLA does not exclude a physician health care provider from providing an opinion about the standard of care that should be provided by another type of health care provider. As a summary of this principle, we quote from one of our sister courts:

> The person offering the expert opinion must do more than show that he is a physician, but he "need not be a specialist in the particular area of the profession for which testimony is offered." *Owens v. Handyside*, 478 S.W.3d 172, 185 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) [(op. on reh'g)]. The critical inquiry is "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996). A physician may also be qualified to provide an expert report, even when his specialty differs from that of the defendant, "if he has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant[]" or "if the subject matter is common to and equally recognized and developed in all

---

[3]The term "practicing health care" is further defined in the MLA as including the following: (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. Tex. Civ. Prac. & Rem. Code Ann. § 74.402(a). This section is not an exclusive list of the means of practicing health care. *Group v. Vicento*, 164 S.W.3d 724, 727 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

9

fields of practice." *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

*Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 171 (Tex. App.—Houston [14th Dist.] 2020, pets. denied).

As an example of this principle, the MLA permits a physician to opine whether nursing staff breached a standard of care. *See Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, No. 02-10-00342-CV, 2011 WL 3211239, at *4 (Tex. App.—Fort Worth July 28, 2011, no pet.) (mem. op. on reh'g) (noting that when a physician states that he is familiar with the standard of care for both nurses and physicians and for the prevention and treatment of the illness, injury, or condition involved in the claim, then the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers); *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.) (holding that the doctor expert's statement—that he had worked with nurses, nurse practitioners, physician's assistants, and physicians (including emergency-room physicians) and was familiar with the standards of care that applied to such health care providers in similar situations—was sufficient to show that the expert was qualified to render an opinion as to each type of health care provider); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 813 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (concluding that the doctor was sufficiently qualified to opine on the standard of care for professional nurses because the doctor had opined that he had either trained,

10

consulted, or observed health care providers in the same field as the defendants and was "familiar" with the standard of care for nurses in the treatment of the particular injury at issue); *Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 759–62 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that the doctor's familiarity and experience with the standard of care in treating the plaintiff's condition and in supervising nurses and other personnel in treating the plaintiff's condition was sufficient qualification for the doctor to opine on the standard of care of a nurse who had treated the plaintiff's condition).

What a physician must state to show the necessary familiarity with the standard of care of a nonphysician health care provider is, at bottom, commonsensical. That is, if the physician expert states that he or she is familiar with

> the standard of care and responsibilities and requirements for the pertinent category of non[]physician health care provider, and he has worked with, interacted with, and supervised that category of non[]physician health care provider, then the physician is qualified to opine on the issue of whether the health care provider departed from the accepted standards of care for that category of health care providers.

*Jepson v. Wyrick*, No. 02-18-00148-CV, 2019 WL 2042303, at *7 (Tex. App.—Fort Worth May 9, 2019, no pet.) (mem. op.). Our question is what proof a report must provide to establish that the expert has the requisite expertise to speak to the actions of the other provider.

As a starting point, there is a distinct demarcation that circumscribes what may be examined to determine the expert's qualifications. Just as with other aspects of the

expert report, our review of whether an expert has demonstrated his or her qualifications is limited to the four corners of the expert's report and attached curriculum vitae. *Monga v. Perez*, No. 14-16-00961-CV, 2018 WL 505263, at *6 (Tex. App.—Houston [14th Dist.] Jan. 23, 2018, pet. denied) (mem. op.) ("We look only to the four corners of the expert report and the curriculum vitae to determine whether an expert is qualified." (citing *Mem'l Hermann Healthcare Sys.*, 230 S.W.3d at 758)).

A concurrence by Justice Bland of the Texas Supreme Court recently offered an overview of what standard the MLA creates to determine whether the writer of an MLA report has stated the necessary qualifications to render opinions:

> Our precedent on witness qualification is spartan and easily understood. *See Broders* . . . , 924 S.W.2d [at] 148 . . . . Chapter 74 imports its expert criteria from the Texas Rules of Evidence. Tex. Civ. Prac. & Rem. Code[ Ann.] § 74.351(r)(5)(C). The relevant rule provides[,]
>
>> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> Tex. R. Evid. 702.
>
>> Not every medical doctor is qualified to testify on every medical issue. *Broders*, 924 S.W.2d at 152. The offering party must establish that the witness has "knowledge, skill, experience, training, or education" pertaining to the specific issue before the court "which would qualify the expert to give an opinion on that particular subject." *Id.* at 153. However, the inquiry is not myopic. *See Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006) (explaining that "expert qualifications should not be too narrowly drawn").

*Walker v. Baptist St. Anthony's Hosp.*, No. 23-0010, 2024 WL 5099109, at *7 (Tex. Dec. 13, 2024) (Bland, J., concurring).

To establish that the report writer meets the necessary standards, the report must "articulate a factual basis" that establishes that the expert is qualified. *Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *7 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.) (citing and quoting *Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 183–84 (Tex. App.—Austin 2017, no pet.)). A recent opinion of this court offers guidance as to what adequately "articulate[s] a factual basis." In *Columbia Medical Center of Arlington Subsidiary, L.P. v. J.B.*, we carefully surveyed this court's precedent on the question of what achieves an adequate articulation of a factual basis that an expert is qualified. No. 02-20-00190-CV, 2021 WL 5132535, at *3–7 (Tex. App.—Fort Worth Nov. 4, 2021, no pet.) (mem. op.). Our initial holding is not surprising; the factual basis must be stated beyond mere conclusions, i.e., cursory statements that the expert is familiar with the standards about which the expert is opining do not pass muster. *Id.* at *6; *see also Jepson*, 2019 WL 2042303, at *9 (concluding that the doctor failed to establish his qualifications to opine as to the standard of care because the report's statement that the doctor was familiar with the standard of care was conclusory in the absence of some explanation as to how the doctor had become familiar with that standard); *Ibrahim v. Gilbride*, No. 14-09-00938-CV, 2010 WL 5064430, at *8 (Tex. App.—Houston [14th Dist.] Dec. 9, 2010, no pet.) (mem. op.) (holding that statement—

13

expert is "experienced in and familiar" with the standard of care—is "too general and conclusory to support a conclusion that [expert] is qualified to opine in this matter"); *Ly v. Austin*, No. 03-05-00516-CV, 2007 WL 2010757, at \*5 (Tex. App.—Austin July 13, 2007, no pet.) (mem. op.) ("An expert cannot rely on generalized, conclusory statements to establish her qualifications; she must provide specific details of her training and experience." (first citing *Forrest v. Danielson*, 77 S.W.3d 842, 848 (Tex. App.—Tyler 2002, no pet.); and then citing *Tomasi v. Liao*, 63 S.W.3d 62, 66 (Tex. App.—San Antonio 2001, no pet.))).

*Columbia Medical Center of Arlington* articulated the standard that we apply:

Bound as we are to discern [the doctor's] qualifications only from within the four corners of his report and CV, *e.g.*, *Jacksboro Nursing*, 2021 WL 1421431, at \*4, we cannot find or infer from either document any familiarity with hospital-specific administrative standards of care that would qualify him to opine about proper testing and diagnosis, about the "triple rule out" protocol, or about discharge policies. Indeed, although his report states—quite accurately, it seems—that he is "familiar with the evaluation and treatment of cardiac patients with clinical presentations similar to" [the decedent], he does not state that he is similarly familiar with how *hospitals* develop and put into place (or should put into place) the policies and procedures he outlines. *See Alvarez*, 2011 WL 3211239, at \*5 (holding that report was deficient where physician did not state that as a result of his service as chair of hospital quality-improvement committee and as member of clinical case-review committee he had become "familiar with the standard of care for a reasonable, prudent hospital in training its nurses, in enforcing its policies and procedures, and in supervising its nurses" or that his committee service had produced "experience in formulating, implementing, or monitoring either hospital nurses' training or enforcement of hospital policies and procedures or hospital nurses' supervision"); *cf.* [*Tex. Health Harris Methodist Hosp. Fort Worth v.*] *Biggers*, [Nos. 02-12-00486-CV, 02-13-00040-CV,] 2013 WL 5517887, at \*4 [(Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.)] (holding that "cursory statement" that

14

physician was "'fully familiar with standards of care that involve preservation of tissue and storing of tissue by . . . hospitals'" was not enough to establish his qualifications to opine about those standards).

2021 WL 5132535, at *7 (footnote omitted). Thus, we conclude that there must be facts stated within the four corners of the report and attached CV from which we may conclude that the expert has familiarity with the standards about which the expert opines, and a mere assertion of familiarity—without a reference to facts showing how that familiarity was acquired—is not sufficient because it is conclusory. *See id.*

**D.** **We explain why we conclude that Dr. Schmidt's report adequately demonstrates his qualifications.**

To apply the principles we have outlined, we must juxtapose the standards of care that Dr. Schmidt asserts should govern the treatment of Ms. Chatman with his stated qualifications and determine whether he has provided a nonconclusory factual basis to show his knowledge of the standard and the qualifications to state what it should be. Dr. Schmidt's report specifies that the standard of care required by the nursing staff of Longmeadow (for which it is vicariously liable when its employees breach the applicable standard of care) is as follows:

> In order to meet the standard of care, Longmeadow is required to provide a level of care and treatment that an otherwise reasonable and prudent, similar nursing facility and staff would provide under the same, or similar, circumstances. Specifically, in order to meet the standard of care, a nursing facility such as Longmeadow, must ensure that its residents receive, and are provided with, the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being.

15

The standard of care for Longmeadow was to ensure the safety of Ms. Chatman and prevent injury. In the present case, Ms. Chatman entered the facility with a diagnosis of [d]ementia. Nursing staff of Longmeadow knew from the behaviors displayed by Ms. Chatman that they were required to increase supervision of Ms. Chatman due to her wandering tendencies.

The standard of care requires that nursing staff supervise a resident with known behavioral issues from wandering and likely antagonizing other residents. In the present case, Ms. Chatman had a history of antagonizing other residents through no fault of her own[] but as a result of her Alzheimer's disease. The standard of care would [have] require[d] nursing staff to provide Ms. Chatman with supervision as she ambulate[d] [i]n the unit. Had nursing staff been present and offer[ed] Ms. Chatman the assistance she needed, she, more likely than not, would not [have] wander[ed] into other rooms, and more likely than not to a reasonable degree of medical probability, other residents would not [have] attack[ed] her.

The standard of care would [have] require[d] that nursing staff of Longmeadow move Ms. Chatman to a room closer to the nursing station to better allow them to monitor her. They failed to do so. There is a note in the record dated 9/15/22[,] wherein nursing staff document[ed] that they [had] attempted to call family members about a room change. There is nothing in the medical record to indicate that the recommendation for a room change was followed up on with her family or further discussed with her responsible party, as it should have been.

The standard of care required that nursing staff of Longmeadow monitor Ms. Chatman at 15-minute intervals. Given her propensity to wander, a monitoring log was needed on Ms. Chatman. The standard of care was breached as there was no documentation that nurses were frequently watching Ms. Chatman as well as other potentially aggressive residents.

Nursing staff breached the standard of care in the manner above. Due to the failings of nursing staff, Ms. Chatman was assaulted by another resident and suffered facial trauma, skin tears, extensive bruising to her left arm and forearm, and pain in her left arm and left upper leg, all of which caused pain, suffering, and disfigurement.

16

In essence, the report turns on the standard of nursing care required for a patient with a known diagnosis of dementia and what should have been done to address the wandering tendency of patients with this diagnosis (and specifically to prevent Alzheimer's patients with known wandering tendencies from antagonizing other patients). Dr. Schmidt opines that two relatively straightforward actions should have been taken to address the wandering tendency of patients with Ms. Chatman's diagnosis: (1) placing her in a room closer to the nurse's station, and (2) monitoring her at fifteen-minute intervals.

We must decide whether Dr. Schmidt's report and CV shows in a nonconclusory manner (1) why Ms. Chatman's treatment should be governed by this standard of care and (2) whether he has experience to know what should be done to meet the standard. Dr. Schmidt's CV in this matter is bare boned; for this reason, we focus only on the terms of his report. Dr. Schmidt's report has a section titled "qualifications" that references his background in two places. First, the report states,

> Please see my attached CV. I have over 33 years of medical experience as a physician. I am currently a private[-]practice physician licensed in the states of Alabama, Texas, New Mexico, and Missouri. I devote at least 95% of my professional time to the active clinical practice of medicine. I devote at least 70% of my primary[-]care practice to the care and treatment of adult and geriatric patients. I have experience in the care and treatment of patients and residents of skilled nursing facilities, private residence[s,] and assisted living facilities whom I see at my clinic on an outpatient basis. At the time of the occurrence of the injuries complained of, I worked full-time as a physician. As a physician, I am very familiar and have had occasion to treat a large number of patient[s] who have complaints of dementia and wandering. In my practice, I have treated over 100 patients who have underlying conditions that would

17

make them susceptible to wandering behavior. In that regard, I am familiar with the prevention and mitigation of the injuries complained of, as well as interventions that should be used by direct care staff to prevent wandering of residents. I have knowledge of the standards of care related to the prevention and treatment of injuries related to wandering, such as those of Ms. Chatman. I have extensive experience in preventing or mitigating injuries resulting from wandering in residents/patients whose medical history places them at high risk for elopement or wandering behavior while in nursing homes. I have written orders for treatments for the prevention of wandering. I am knowledgeable of the standards of care of the nursing staff of long-term care facilities and skilled[-]care nursing facilities, having worked with nursing staff in the coordination of care of residents of such facilities. I have experience in prevention or mitigation of the injuries that are complained of. A copy of my curriculum vitae is attached as Exhibit A.

Later, the report states,

In the regular course of my medical practice, I have had occasion to diagnose and treat residents with conditions similar to or identical to Ms. Chatman who have experienced wandering behavior while under the care of skilled nursing facilities. I have extensive knowledge and experience of the injuries complained of and that were suffered by Ms. Chatman. I also am familiar with the standards for skilled nursing facilities, as well as nursing staff who are employed by skilled nursing facilities in the provision of care to residents such as Ms. Chatman. I have written orders for nursing staff for monitoring of patients who are at risk of wandering. I have supervised the execution of these orders by RNs, LVNs[,] and [CNAs] who were assigned to provide hands-on care to residents. These orders included orders for the prevention of wandering behavior in residents. I am familiar with the duties and interventions used in the prevention of wandering. I am familiar with the standards of care for the skilled nursing facility involved in this claim as well as the standards of care as they pertain to RNs, LVNs[,] and CNAs who were providing care to Ms. Chatman.

Dr. Schmidt's report takes refuge at many points in the conclusion that he is familiar with matters relevant to the standard of care. Our question is whether he put sufficient meat on the bones of this conclusion to show that he has the training and

18

experience to support that conclusion. The specifics offered by the doctor—that he has knowledge of what a "similar nursing facility and staff would provide under the same, or similar, circumstances" to Ms. Chatman's—are as follows:

- 70% of Dr. Schmidt's primary-care practice involves treating adult and geriatric patients (though he does not specify the breakdown between adults and geriatrics).

- The report states that Dr. Schmidt has "experience in the care and treatment of patients and residents of skilled nursing facilities, private residence[s,] and assisted living facilities *whom I see at my clinic on an outpatient basis.*" [Emphasis added.] This statement provides at least a minimal basis to support a conclusion that he has experience in treating patients on an outpatient basis who are in the same treatment environment as Ms. Chatman.

- Dr. Schmidt states that he has specific experience with patients who suffer from dementia (as did Ms. Chatman) and because of this or another illness tend to wander. Dr. Schmidt states that he has had "occasion to treat a large number of patients who have complaints of dementia and wandering" and has "treated over 100 patients who have underlying conditions that would make them susceptible to wandering behavior."

- Using the somewhat ambiguous statement "in that regard" apparently to refer to his experience with patients, Dr. Schmidt states that he (1) is familiar with "the prevention and mitigation of the injuries complained of"; (2) is familiar with "interventions that should be used by direct care staff to prevent wandering of residents"; (3) has "knowledge of the standards of care related to the prevention and treatment of injuries related to wandering, such as those of Ms. Chatman"; and (4) has "extensive experience in preventing or mitigating injuries resulting from wandering in residents/patients whose medical history places them at high risk for elopement or wandering behavior while in nursing homes."

- Dr. Schmidt then augments the nature of his experience by stating the specifics of how he has directed nursing staff to address the concern that

19

a patient will wander and has worked with staff to achieve the standard of care by directing their efforts:

> I have written orders for treatments for the prevention of wandering. I am knowledgeable of the standards of care of the nursing staff of long-term care facilities and skilled[-] care nursing facilities, having worked with nursing staff in the coordination of care of residents of such facilities. I have experience in prevention or mitigation of the injuries that are complained of.

- In the second section of the report quoted about his qualifications, Dr. Schmidt again reiterates how his medical practice has given him the necessary experience to opine on the standard of nursing care that should apply to Ms. Chatman:

> In the regular course of my medical practice, I have had occasion to diagnose and treat residents with conditions similar to or identical to Ms. Chatman who have experienced wandering behavior while under the care of skilled nursing facilities. I have extensive knowledge and experience of the injuries complained of and that were suffered by Ms. Chatman. I also am familiar with the standards for skilled nursing facilities, as well as nursing staff who are employed by skilled nursing facilities in the provision of care to residents such as Ms. Chatman.

- Again, Dr. Schmidt explains how he gained this experience of directing the care of patients by nursing staff; Dr. Schmidt states,

> I have written orders for nursing staff for monitoring of patients who are at risk of wandering. I have supervised the execution of these orders by RNs, LVNs[,] and [CNAs] who were assigned to provide hands-on care to residents. These orders included orders for the prevention of wandering behavior in residents.

Undoubtedly, Dr. Schmidt could have provided more detail about the topics with which he claims that he is familiar. But our task is not to evaluate whether

20

Dr. Schmidt's statements are credible or to grade him on whether he could have done a better job in composing his report; our task is to decide whether the report crosses the required threshold by providing sufficient nonconclusory information about his qualifications. We conclude that it does. Dr. Schmidt has provided specific information that he treats patients who suffer from the same condition as Ms. Chatman did and the wandering behavior caused by that condition. He has treated patients who are cared for in the same treatment setting as provided by Longmeadow. He catalogs his familiarity with the types and standards of care provided to patients with conditions that cause them to wander. Although he does so in a way that approaches being conclusory, he provides specific information about how he has written orders to nursing staff "for monitoring of patients who are at risk of wandering" and has overseen the execution of those orders. Thus, Dr. Schmidt has provided more than a mere conclusion that he is familiar with the standard of care for the nursing staff who cared for Ms. Chatman and what that standard requires.[4]

As noted, as a physician, Dr. Schmidt can opine on the standard of care of nonphysician health care practitioners so long as he has stated "the standard of care and responsibilities and requirements for the pertinent category of non[]physician

---

[4]The Tyler Court of Appeals recently concluded that a report authored by Dr. Schmidt had passed muster because he had adequately stated his qualifications. *See Willow SNF, LLC v. Hardimon ex rel. Turner*, No. 12-23-00225-CV, 2024 WL 275001, at *5 (Tex. App.—Tyler Jan. 24, 2024, no pet.) (mem. op.). We do not rely on the holding in *Willow* because the standards discussed by Dr. Schmidt in the report that was examined in that appeal are different than the ones before us.

health care provider, and he has worked with, interacted with, and supervised that category of non[]physician health care provider." *See Jepson*, 2019 WL 2042303, at *7. Tested under an abuse-of-discretion standard, the trial court did not err by concluding that Dr. Schmidt has knowledge of the standard of care.

**E. We explain why we reject Longmeadow's challenge to Dr. Schmidt's report.**

Certainly, Longmeadow will disagree with our conclusion, but the challenge that it raises is too broadly couched. Longmeadow argues that

[b]ased upon his report and curriculum vitae, [D]r. Schmidt is currently a primary[-] and urgent[-]care physician. Instead of stating [that] he has any experience in a skilled nursing facility, [D]r. Schmidt merely states[,] "I have experience in the care and treatment of patients and residents of skilled nursing facilities, private residence[s,] and assisted living facilities whom I see at my clinic on an outpatient basis."

Similarly, as opposed to detailing any experience within a skilled nursing facility, [D]r. Schmidt merely states,

> I also am familiar with the standards for skilled nursing facilities, as well as nursing staff who are employed by skilled nursing facilities in the provision of care to residents such as Ms. Chatman. . . [.] I am familiar with the standards of care for the skilled nursing facility involved in this claim as well as the standards of care as they pertain to RNs, LVNs[,] and CNAs who were providing care to Ms. Chatman.

Based upon [D]r. Schmidt's report, the specific issue in this case is a resident-on-resident physical altercation and/or assault in a skilled nursing facility.

While [D]r. Schmidt's report says he has experience in [the] treatment of adult and geriatric patients, his report and [CV] are completely devoid of any experience working in a skilled nursing facility,

managing residents in a skilled nursing facility, or any experience with preventing or mitigating resident-on-resident aggressive actions and/or assaults inside of a skilled nursing facility.

[D]r. Schmidt's report['s] statements that he is familiar with the standard of care for skilled nursing facilities are "conclusory" because there is a complete absence of "some explanation" as to how [D]r. Schmidt became familiar with that standard. [Record references omitted.]

Longmeadow characterizes this case as involving "a resident-on-resident physical altercation and/or assault in a skilled nursing facility" and asserts that Dr. Schmidt's report fails to demonstrate experience in managing this conduct in a nursing-home setting. But the report states, "In the present case, Ms. Chatman had a history of antagonizing other residents through no fault of her own[] but as a result of her Alzheimer's disease." Thus, Longmeadow paints with too broad a brush in its challenge; the report focuses on the standard of care required by nursing staff *to control the wandering that Longmeadow allegedly knew posed a risk of harm to Ms. Chatman because it placed her in conflict with other patients.* The report addresses an overall standard of care to deal with or prevent resident-on-resident altercations but only in the narrow context of controlling wandering for a resident whose known wandering tendency created the danger of such an altercation. Viewed in the context of the standard to prevent wandering, we have detailed how the report—perhaps minimally but adequately—

23

provides facts showing that Dr. Schmidt has knowledge of the standards that should be followed by nursing staff to control wandering.[5]

We overrule Longmeadow's sole issue.

## IV. Conclusion

Having overruled Longmeadow's sole issue, we affirm the trial court's order denying Longmeadow's motion to dismiss.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: January 23, 2025

---

[5]Longmeadow cites our opinion in *Pack v. Crossroads, Inc.*, 53 S.W.3d 492 (Tex. App.—Fort Worth 2001, pet. denied), as support for its argument that Dr. Schmidt's report was deficient. Our holding in *Pack* dealt with an expert's testimony at trial and stated that "the trial court did not abuse its discretion [by] limiting [the nurse's] expert testimony to the standard of care for nurses in a nursing home and [by] excluding [her] testimony about standards of care for a nursing home in general or [the specific nursing home's] breach of such a standard." *Id.* at 507. *Pack* did not deal with an expert report, did not limit the expert's testimony for the standard of care for nurses in a nursing home, and upheld the discretionary decision. *See id.* We therefore conclude that it is inapposite to the issues before us in this appeal.